# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Joseph Iannacchino,                      )
Victor Marchese, and                     )
Soledad Berrios,                         )    CIVIL ACTION NO:
Individually and as                      )    1:05-cv-11141-RCL
    Representatives of a Proposed Class, )
               Plaintiffs, )
                       )
v.                                       )
                       )
Ford Motor Company,                      )
Ford Motor Company of Canada, Ltd.,      )
Magna Donnelly Corporation, Individually )
  And d/b/a Donnelly Corp. and as successor )
  By merger to Donnelly Corp.,           )
Intier Automotive Seating of America, Inc., )
  Individually and d/b/a Dortec Industries, )
And                                      )
Intier Automotive Closures of America, Inc.,)
  Individually and d/b/a Dortec Industries, )
                       )
           Defendants.               )

## PLAINTIFFS' OPPOSITION TO DEFENDANTS INTIER AUTOMOTIVE CLOSURES OF AMERICA, INC.'S AND INTIER AUTOMOTIVE SEATING OF AMERICA INC.'S RULE 12(b)(2) MOTION TO DISMISS AND REQUEST FOR ORAL ARGUMENT

Now come the Plaintiffs who hereby Oppose Defendants Intier Automotive Closures of America, Inc.'s and Intier Automotive Seating of America, Inc.'s Rule 12(b)(2) Motion to Dismiss.[1]

## I.    Introduction

Defendants Intier Automotive Closures and Intier Automotive Seating, hereinafter jointly "Intier," have moved to dismiss the Plaintiffs' claims under Fed. R. Civ. P 12(b)(2), asserting that

---

[1] Before it addresses the issues in this Opposition -- namely whether it may exercise personal jurisdiction over Intier Automotive Closures and Intier Automotive Seating -- this Court must determine whether it has subject matter jurisdiction over these claims. This case was filed in Massachusetts state court and was removed to this Court. Plaintiffs, for reasons to be stated in Plaintiffs' Motion to Remand to be filed on July 1, intend to contend that this removal was improper and, as such, subject matter jurisdiction over this case does not exist. Accordingly, resolution of the subject matter jurisdiction question is a necessarily antecedent to resolution of the personal jurisdiction issue. Indeed, given their position on remand, Plaintiffs submit that this Court will not even have to wrestle with the personal jurisdiction issue.

this Court does not have personal jurisdiction over Intier. Intier claims they neither manufactured the defective door latches integrated into the Ford vehicles sold in Massachusetts, nor injected them into the stream of commerce. Defendants Memorandum of Law in Support of their Rule 12(b)(2) Motion to Dismiss, hereinafter "Def. Mem.," at pp. 1-2. In addition, Intier asserts that it did not conduct any business in Massachusetts nor engage in any systematic course of conduct. *Id.* These contentions are factually inaccurate and should be rejected.

This class action centers on causes of action arising under Mass. Gen. Laws c. 93A §§ 2, 9 and on breaches of various express and implied warranties. The acts that constitute these causes of action encompass the activities of Defendants in designing, manufacturing, installing, supplying, selling, and distributing defective outside door handle systems in model year 1997 to 2000 Ford F-150, Ford F250 (light duty), Ford Expedition or model year 2000 Ford F150 Super Crew vehicles owned by Plaintiffs and members of the proposed Class in the Commonwealth of Massachusetts.

Intier is subject to personal jurisdiction as (1) the Massachusetts long arm statute authorizes the exercise of jurisdiction and (2) the exercise of such jurisdiction comports with due process. Plaintiffs assert that Intier manufactured and distributed certain components of the door latch systems and was responsible as the system integrator for Ford Motor Company for the D21 door latch assembly systems that do not comply with Federal Motor Vehicle Safety Standard ("FMVSS") 206. Upon information and belief, certain components that are installed in the D21 door latch assembly were bought from a supplier, Stoneridge, a Massachusetts corporation, and subsequently assembled by Intier into the D21 door latch assembly. These parts were then placed into the stream of commerce by Intier, and were then incorporated into Ford vehicles. Ford vehicles containing the defective door latches were then sold in Massachusetts to the named

2

Plaintiffs and members of the proposed class. In addition, Intier has engaged in other business conduct in Massachusetts including advertising its business and services. Importantly, Intier's Lead Director, Louis Lataif, is a resident of the forum where he undertakes the business of Intier's Board of Directors.

As discussed further below, as global manufacturers of automotive closure components that are incorporated in automobiles, Intier has sufficient minimum contacts with Massachusetts to assert general personal jurisdiction. Likewise, these contacts are sufficient to assert specific personal jurisdiction. In the alternative, if the court finds sufficient grounds to dismiss the complaint under Fed. R. Civ. P 12(b)(2), the Plaintiffs request that the court use its discretion to allow limited discovery on the issue of personal jurisdiction.

## II.    **Factual Background**

Intier admits that they are Delaware corporations with principal places of business in Michigan. Def. Memo at p. 4. However, Intier also asserts that they "have never manufactured, distributed, or sold any component of the door latches upon which plaintiffs base their claims," and that both, "do not manufacture, sell, or distribute any door latch component parts." Def. Memo at p. 2-3. The Defendants have also produced affidavits, claiming that Intier Closures "is solely an engineering firm," and that "Intier Closures and Intier Seating are both non-resident corporations that have no contact whatsoever with Massachusetts that would subject them to personal jurisdiction in this forum." "Tait Aff." at ¶ 4. The Defendants then conclude that this court cannot exercise personal jurisdiction over them. However, the Defendants' baseless assertions and disingenuous affidavits fundamentally differ from previous documents filed in other litigation in this Court, and from public information.

Before this Court Intier "admit[ed] that it is an automotive supplier engaged in the design, manufacture and supply of automotive closure systems, components and parts." *See,* Answer to the Amended Complaint, Counterclaims, and Demand for Jury Trial in *Stoneridge Control Devices v. Intier Auto. Closures,* CV No. 02-CV-10803, in the United States District Court for the District of Massachusetts, attached hereto as Exhibit A at ¶ 9.  Specifically, Intier "admit[ed] that is has assembled Stoneridge's ADLA products together with other parts to create a door latch and power lock assembly, and that it has sold and still sells assemblies to Ford." *Id.* at ¶ 13.  Intier also indicated that it "is a 'corporation' and engages in 'trade or commerce' within the meaning of Mass Gen. Laws. c. 93A, § 1." *Id.* at ¶ 66.  That is, in these filings, Intier admitted that it purchased constituent parts for its door latch assemblies from Massachusetts, constructed those assemblies in Michigan, and then sold those assemblies to Ford, who incorporated them in vehicles sold in Massachusetts.

Moreover, in the *Stoneridge* action, Intier Closures directly and purposefully availed itself of the laws of the forum by filing a counterclaim against Stoneridge under Mass. Gen. Laws c. 93A, also the basis of Plaintiffs' claims in this litigation.  Exhibit A at p. 29.  Intier's answer raised counterclaims for breach of contract, which clearly demonstrates that Intier has in fact contracted to (and actually has) transact business in Massachusetts.  *Id.*  Therefore, Intier clearly has contacts sufficient for this Court to find jurisdiction.  Furthermore, when that litigation was terminated by a motion to dismiss, Intier signed a document indicating that "this court has jurisdiction over Stoneridge's claims for Violation of and Unlawful Use of Trade Secrets and Proprietary Information and Violation of Mass Gen. Laws Chapter 93A *and over the parties hereto*."  Agreed Motion To Dismiss Certain Stoneridge Claims attached hereto as Exhibit B at ¶ (1) (emphasis added).  These

4

statements and the underlying conduct supports this Court's exercise of both specific and general personal jurisdiction over Intier.

Intier also has other continuous contacts with the forum. Upon information and belief, Intier regularly conducts business in Massachusetts by shipping aftermarket replacement parts to Ford Authorized Service Dealers in Massachusetts to replace and/or repair defective or malfunctioning door latch system hardware in vehicles brought in for service at dealers in Massachusetts. In addition, Intier advertises in several magazines, including *Automotive Engineering* and *Automotive Industries*. Attached hereto as Exhibits C and D, respectively. Both of these magazines are circulated and sold throughout Massachusetts. *See* Publication Circulation Statements for the above, attached hereto as Exhibits E and F, respectively.

Additionally, Louis Lataif, Intier Automotive's Lead Director since March 25, 2003, and board member since August 9, 2001, is a resident of Massachusetts who regularly conducts the business of Intier's Board of Directors from this forum.[2] As such, Intier should be deemed to have contacts with Massachusetts based on Mr. Lataif's conducting board business from the forum. Lastly, at all relevant times, Intier derived substantial economic benefit from the sale of its parts to Ford, which incorporated Intier's door latches into its finished vehicles and sold those vehicles in Massachusetts. As a result of the foregoing, and for reasons discussed more fully below, this Court should deny Intier's Motion to Dismiss.

---

[2] *See* excerpts from, Form 20-F, Annual Report for fiscal year ending December 31, 2003, filed with the US Securities and Exchange Commission, in which Mr. Lataif's residence is listed as Massachusetts. Exhibit G. *See also*, Intier's "Annual Information Form 2005," noting that one of the company's directors is "LOUIS E. LATAIF (A)(B), Massachusetts, U.S.A., Director since August 9, 2001 and Lead Director since March 25, 2003..." and that "Mr. Lataif, 66, has served as Dean of the School of Management of Boston University for the past fourteen years. Prior to that time, he was employed at Ford Motor Company for approximately 27 years in various senior operational and sales and marketing capacities...." Exhibit H.

III.    **Argument**

A.    **Intier Is Subject To Personal Jurisdiction In Massachusetts**

In the interest of fairness, Intier should not now be allowed to deny that this Court has jurisdiction over it when it has previously consented to, and, more importantly, directly availed itself of, the jurisdiction of this Court in similar litigation. Furthermore, Intier has and purposefully availed itself of the benefits and protections of the laws of Massachusetts through a continuous course of dealing and business transactions within the Commonwealth. As a result of these transactions, Intier should be aware of the possibility that it could be hailed into court in Massachusetts. Therefore, this Court should find that it has jurisdiction over Intier and Intier's Motion to Dismiss based on a lack of personal jurisdiction should be denied.

1.    **Intier Has Previously Consented To And Availed Itself Of Massachusetts' Laws.**

The requirement of personal jurisdiction represents a personal right and therefore can be waived or for various reasons a defendant may be estopped from raising the issue. *Insurance Corp. of Ireland, LTD. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703, 102 S.Ct. 2099, 2105 (1982). It is well settled that a "defendant may manifest consent to a court's in personam jurisdiction in any number of ways, from failure to seasonably interpose a jurisdictional defense ... to submission implied from conduct." *General Contracting & Trading Co., LLC v. Interpole, Inc.*, 940 F.2d 20, 22 (1st Cir. 1991). Importantly, "a party's consent to a court's jurisdiction may take place prior to the suit's institution." *Id.* at 22.

While in *this* action Intier has asserted its objection to personal jurisdiction, in prior litigation in this very Court, dealing with the very same door latch components that were inserted in the Ford vehicles that form the basis of this action, Intier not only failed to contest personal jurisdiction, but in fact consented to jurisdiction and availed itself to the laws of this forum. By

6

unconditionally raising counterclaims for misrepresentation, unjust enrichment, breach of contract, and violation of Mass. Gen. Laws c. 93A, Intier purposefully and unequivocally availed itself of the laws of this forum. *See*, Exhibit A. Moreover, counsel for Intier signed a document indicating that the District of Massachusetts "has jurisdiction over Stoneridge's claims for Violation of and Unlawful Use of Trade Secrets and Proprietary Information and Violation of Mass. Gen. Laws Chapter 93A *and over the parties hereto*." Exhibit B, ¶ (1) (emphasis added).

Ordinarily, courts "should not treat counterclaims – at least compulsory counterclaims – as waivers of jurisdictional objections." *General Contracting*, 940 F.2d at 24. However, this principle is conditioned on the premise that "the counterclaim is put forward as a conditional position and will not be independently pressed if the primary action is dismissed for lack of personal jurisdiction." *Id.* at 25. Intier consented to, and further invoked, the jurisdiction of the District of Massachusetts related to the manufacturer of door latch materials in Massachusetts. However, Intier protests to the jurisdiction of this same Court where the present claims are based on the completed door latch assemblies in vehicles sold in Massachusetts. This position is inconsistent, and Intier should be estopped, in the interest of fairness, from now asserting a lack of jurisdiction. Giving effect to Intier's tortured interpretation of the Massachusetts long arm statute would allow Intier to assert claims under Massachusetts law when it saw fit, but would insulate it from any liability under those same laws. Such an interpretation would "produce an unjust asymmetry." *Id.*

### 2. Plaintiffs Have Satisfied Both Prongs of Massachusetts' Personal Jurisdiction Test.

In Massachusetts, to assert personal jurisdiction over a non-resident defendant, the court must inquire whether "(1) the plaintiff has demonstrated that the assertion of jurisdiction is authorized by statute, and, if authorized, (2) whether such jurisdiction comports with the restraints imposed by the Due Process Clause of the United States Constitution." *Comer v. Comer,* 295

F.Supp.2d 201, 206 (D.Mass. 2003).   Moreover, "[i]t is the plaintiff's burden to establish that the

forum court has jurisdiction over the person of the sued defendant." *Rodriguez v. Fullerton Tires*

*Corp.*, 115 F.3d 81, 85 (1st Cir. 1997).   To establish jurisdiction, the Plaintiffs "must go beyond the

pleadings and make affirmative proof." *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (C.A.1,

1992).   As will be explained below, Plaintiffs satisfy both the long arm statute and the due process

clause of the Constitution, such that the exercise of personal jurisdiction over Intier is appropriate

and sound.

**3.      The Massachusetts Long-Arm Statute Authorizes the Assertion of Jurisdiction
Over Intier.**

**a.      Intier Transacts Business In Massachusetts.**

First, jurisdiction is appropriate under the Massachusetts long-arm statute, Mass. Gen.

Laws ch. 223A, § 3(a).   Section 3(a) provides that "a court may exercise personal jurisdiction over a

person, who acts directly or by an agent, as to a cause of action in law or equity arising from the

person's transacting any business in this commonwealth."   Mass. Gen. Laws ch. 223A, § 3(a).

Under Massachusetts law, the "transacting business" test of the state's long-arm statute is designed to

identify deliberate, as distinguished from fortuitous, contacts with forum by nonresident party, with

view to determining whether possible need to invoke the benefits and protections of the forum's laws

was reasonably foreseeable. *Lyle Richards Int'l., Ltd. v. Ashworth, Inc.*, 132 F.3d 111 (1st Cir.

1997).   The "arising from" clause in state's long-arm statute, which permits jurisdiction over

persons arising from the transaction of business in state, is to be generously construed in favor of

asserting personal jurisdiction, by applying "but for" causation test which asks whether defendant's

contacts with state constitute first step in train of events that resulted in injury. *Id.* This means that

"a claim arises from a defendant's transaction of business in the forum State if the claim was made

possible by, or lies in the wake of, the transaction of business in the forum State." *National Med.*

*Care, Inc. dba v. Home Med. of Am., Inc,.* 2002 WL 31187683, *3 (Mass.Super. 2002).

Furthermore, section 3(a) does not require that the business be transacted within the physical bounds

of Massachusetts. *JMTR Enters., LLC v. Duchin,* 42 F.Supp.2d 87, 96 (D.Mass.1999). The mere

transmission of facts or information into Massachusetts via telephone or mail would constitute

evidence of a jurisdictional contact directed into the forum state for purposes of Massachusetts long-

arm statute and due process clause. *Id.* That is, "even just a few acts on a defendant's part can often

suffice to satisfy the long-arm statute's threshold for transacting business. *Workgroup Technology*

*Corp. v. MGM Grand Hotel*, LLC 246 F.Supp.2d 102, 110 (D.Mass. 2003)

While Intier may not maintain an office or own property within Massachusetts, it has

regularly conducted business in the Commonwealth by purchasing constituent parts of its door latch

systems, parts of the overall components alleged to be defective and at issue in this litigation, from a

Massachusetts corporation, Stoneridge Control Devices.   In addition, Intier's Director Louis Lataif

resides and has an office in Massachusetts where he conducts the business of Intier's Board of

Directors.  Also, Intier advertises its business and services in magazines that are circulated and sold

in Massachusetts.  This satisfies the requirements of § 3(a).

In its Memorandum in Support of Motion to Dismiss, Intier asserts that "Intier Closures

and Intier Seating do not manufacture, distribute, or sell door handle systems at all, and therefore,

had no connection with presence of such latches in Massachusetts." Def. Memo at p. 9.  Contrary to

its recent assertions in this very Court, Intier has previously "admit[ed] that it has assembled

Stoneridge's ADLA products together with other parts to create a door latch and power lock

assembly that it has sold and still sells to Ford." Exhibit A at ¶ 14.  This admission is doubly

damning, as it not only reveals that Intier assembled and sold the door latches at issue in this

litigation to Ford, which Intier has heretofore disingenuously denied, but also indicates that Intier

acquired component parts for these door latch assemblies via commercial transactions with Stoneridge, a Massachusetts corporation. It is Plaintiffs' belief that the ADLA parts Intier purchased from Stoneridge were then incorporated into the completed door latch assemblies which are at issue in this litigation. As a result, the act of purchasing such door latch parts in Massachusetts, which were subsequently incorporated into the offending Ford vehicles and shipped back to Massachusetts, should be construed as an act or omission within the Commonwealth sufficient to form the basis of this Court's jurisdiction over Intier.

Intier relies on *Commonwealth v. SeKap S.A. Greek Cooperative Cigarrette Mfg. Co.,* 2004 WL 1589210, (Mass. Super. Apr. 13, 2004) to establish that Intier did not transact business in Massachusetts. However, its reliance on *SeKap* is misplaced. In *SeKap*, "the Commonwealth's only allegation that SeKap transacted business in the Commonwealth [was] the fact that 2.6 million of SeKap's cigarettes eventually were purchased by Massachusetts consumers." 2004 WL 1589210 at *2. Indeed, in that matter, there were "no other allegations of any other contacts with the Commonwealth, and there [were] no allegations that SeKap 'purposefully availed itself of the privilege of conducting business within the [Commonwealth], thus invoking the benefits and protections of its laws." *Id.*

Conversely, in the instant matter, there is ample evidence of both Intier's contacts with the forum and its purposeful availment of the protection of the laws of Massachusetts. Intier Closures supplied Ford with defective door latches, the constituent parts of which they purchased in Massachusetts. Intier has engaged in placing the defective parts into the stream of commerce, such that the door latches arrived in Massachusetts in a defective condition. In 1993 Intier and Kelsey-Hayes began "discussing the possibility of Kelsey Hayes designing ADLA parts for Intier," specifically "D21 adjunct actuators." Exhibit A. In 1995, Stoneridge acquired Kelsey-Hayes. In

1996, Intier Closures entered into purchasing agreement to acquire ADLA door latch parts from

Stoneridge, a corporation with offices in Boston and Canton, Massachusetts. *Id.*, ¶ 25. Intier

admitted that it met with Stoneridge on July 17, 1997 and entered into an agreement "governing

ADLA sales from Stoneridge to Intier" *Id.* at ¶ 28. Intier also admitted that it sent an e-mail to

Pollack, Stoneridge's subsidiary, which stated that "Ford has awarded the U222/228 programs to

Dortec. The U222/228 systems include the D21 latch with adjunct actuator. Pollak has been

confirmed as the source of the Adjunct actuator for this program." *Id.* at ¶ 40. Throughout the

course of the contract Intier directed communications to and received communications from

Massachusetts, and received delivery of the parts from Massachusetts. To date, Plaintiffs believe

that over 48,000 Ford vehicles have been identified in Massachusetts which contain the defective

door latch assemblies. This is clear evidence of Intier's contacts with Massachusetts. However, this

is hardly the only indicia of conduct by Intier's that subjects it to this Court's personal jurisdiction.

### b.     Intier Caused Tortious Injury by An Act Or Omission in Massachusetts.

Section 3(c) of the Massachusetts long-arm statute also authorizes personal jurisdiction

over Intier. That section allows jurisdiction where a defendant causes "tortious injury by an act or

omission in this commonwealth." Mass. Gen. Laws c.223A, § 3(c). Actions pursuant to ch. 93A are

neither wholly tortious nor wholly contractual in nature. *Standard Register Co. v. Bolton-Emerson,*

*Inc.*, 649 N.E.2d 791, 38 Mass.App.Ct. 545 (Mass. 1995). However, it is assumed that a chapter

93A claim would constitute a "tortious injury" under the long-arm statute." *Lyle Richards*, 132 F.3d

at 111. Intier acquired certain components of its door latch assemblies from Massachusetts, and

incorporated them into the door latch systems at issue herein. Intier then sold the assemblies to Ford

who incorporated them in vehicles that entered the stream of commerce and were sold to Plaintiffs

and members of the proposed class in Massachusetts. The acts of contracting to acquire parts in

11

Massachusetts, actually acquiring parts in Massachusetts, and subsequently assembling those parts into a defective door latch system sold in a vehicle in Massachusetts, is sufficient to assert that Intier caused tortious injury within Massachusetts. Even if this Court determines that the door latch parts Intier purchased in Massachusetts were not incorporated into the Ford vehicles that were sold in Massachusetts, Intier still committed a tortious act outside of the Commonwealth by placing the defective door latch assemblies into the stream of commerce which were subsequently bought by the proposed plaintiff class, thereby tortiously injuring them in Massachusetts, as discussed below.

c.    **Intier Regularly Did And Solicited Business, Engaged In Other Persistent Courses Of Conduct, And Derived Substantial Revenue From Goods Used Or Consumed Or Services Rendered In Massachusetts.**

Section 3(d) of Massachusetts's long-arm statute authorizes the exercise of jurisdiction over Intier as well. This section first requires that the plaintiffs show that Intier's act or omission caused tortious injury within Massachusetts. Mass. Gen. Laws. ch. 223A, § 3(d). This is discussed above. Second, the plaintiffs must show that Intier had additional contacts with the Commonwealth, namely that Intier either (1) regularly does or solicits business in Massachusetts, or (2) that Intier engaged in other persistent courses of conduct in Massachusetts, or (3) that Intier derived substantial revenue from goods uses or consumed or services rendered, in Massachusetts. *Id.*

Intier asserts that it does not "have an office, address, telephone number, employees, agents, or other physical presence in Massachusetts." Tait Aff. ¶ 4; Copeland Aff. ¶ 4. This statement, even if true, is not determinative of the long-arm analysis under § 3(d), and is also misleading. The Lead Director of Intier's board of directors is Mr. Louis Lataif, a long-time resident of Massachusetts, a clear indication that Intier has a visible presence in Massachusetts. *See infra*, footnote 1. Mr. Lataif would have regularly conducted the business of Intier's Board of Directors from his home and/or office in Massachusetts. Moreover, based on Intier's continuous course of

dealing with Stoneridge, a Massachusetts corporation, Intier has "solicit[ed] business in

Massachusetts, ...engage[d] in ... [a] persistent course of conduct in Massachusetts ... [and]

derive[d] substantial revenue from goods used or consumed in Massachusetts." Intier both acquired

goods from Massachusetts and placed goods into the stream of commerce in Massachusetts during

the years 1997-2002, if not longer. Furthermore, upon information and belief, Intier, as aftermarket

replacement part seller, provided replacement parts to Ford Service Division installations in

Massachusetts guaranteed under Ford's warranties to consumers. These activities were substantial

and continuous, and from them Intier regularly derived revenue within Massachusetts.

In addition, Intier currently "advertises, sells, delivers, or distributes goods or services in

Massachusetts." Intier advertises its business and services in several magazines, including

*Automotive Engineering* and *Automotive Industries*. Attached hereto as Exhibits C and D,

respectively. Both of these magazines are circulated and sold throughout Massachusetts. *See*

Publication Circulation Statements for the above, attached hereto as Exhibits E and F, respectively.

Accordingly, Intier has reaped the benefits of transacting business in Massachusetts, in conjunction

with its tortious conduct occurring outside Massachusetts. Therefore, Intier is subject to the personal

jurisdiction of this Court.

### 4. Exercise Of Personal Jurisdiction Over Intier Would Not Violate Due Process.

Because Massachusetts' long-arm statute authorizes the exercise of jurisdiction over Intier,

the next issue is whether the exercise of that jurisdiction comports with due process requirements

imposed by the Fourteenth Amendment to the United States Constitution. *Comer*, 295 F.Supp.2d at

206. The due process clause "permits a state to exercise jurisdiction over a non-resident defendant

only when the defendant has sufficient minimum contacts with the forum." *Callahan v. Harvest Bd.*

*Int'l Inc.*, 138 F.Supp.2d 147, 158 (D.Mass 2002). "In analyzing minimum contacts, courts have

recognized that jurisdiction can be specific or general." *Id.*   Under this test, jurisdiction is proper if the defendant has minimum contacts with the forum state, such that the lawsuit would not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). The defendant must also have purposefully availed itself of the "privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253 (1953).

Massachusetts recognizes both specific personal jurisdiction, where the cause of action arises out a defendant's activities in the commonwealth, and general personal jurisdiction, where the cause of action does not concern the defendant's activity in the commonwealth, but the defendant engages in a persistent course of conduct or derives substantial revenue from the commonwealth. *Brown Rudnick Berlack Israels LLP v. Brooks,* 311 F.Supp.2d 131(D.Mass.2004). Intier has sufficient contacts and has engaged in persistent conduct sufficient to assert both general and specific jurisdiction over it in Massachusetts, and the exercise of such jurisdiction would comport with due process.

### a.     Intier Has Continuous And Systematic Contacts With Massachusetts To Support The Exercise Of General Jurisdiction In This Forum.

In a motion to dismiss for lack of personal jurisdiction, the court must consider "specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim ... [and] then add to the mix facts put forward by the defendants, to the extent that they are uncontradicted." *Workgroup Technology Corp. v. MGM Grand Hotel, LLC,* 246 F.Supp.2d 102, 108 (D.Mass. 2003). In *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 446 U.S. 408, 414, the Supreme Court noted that "even when the cause of action does not arise out of or relate to the foreign corporation's activities in the forum State, due process is not offended by a State's subjecting the corporation to its in personam

jurisdiction when there are sufficient contacts between the State and the foreign corporation." The Court in *Helicopteros* proffered an non-exclusive list of factors to be considered in determining if a state may exercise personal jurisdiction over a non-resident corporation, including: being authorized to do business in the state, having an agent for service of process within the state, conducting business within the state, selling a product that reaches the state, soliciting business in the state, signing a contract in the state, having an employee based in the state, recruiting an employee in the state, owning real or personal property in the state, maintaining an office or establishment in the state, maintaining records in the state, having shareholders in the state. *Id.* at 41. Based on Intier's previous admissions in other litigation, and other available information, Intier has conducted business within Massachusetts via its dealings with Stoneridge, through its advertising in Massachusetts and sale of products that reached Massachusetts through its dealing with Ford, and has a representative of its Board of Directors in the Commonwealth in the form of its Lead Director Louis F. Lataif. Accordingly, Intier has strong, bilateral contacts with Massachusetts such that general personal jurisdiction should be exercised, as discussed below.

In 1996 Intier entered into negotiations with Stoneridge in Massachusetts to acquire parts for its door latching systems, the product components at issue in this litigation. Exhibit A, ¶¶ 21-25. Then, as mentioned infra, on July 17, 1997, Intier entered into a Long Term Sales Agreement with Stoneridge under which Stoneridge would provide Intier with component parts for its door latch assemblies, which were later sold to Ford. *Id.* at ¶ 28. This ongoing relationship lasted through 2002, when Stoneridge sued Intier. Intier's conduct in that suit also provides support for the exercise of general jurisdiction over it, as it availed itself of the laws of Massachusetts and the jurisdiction of this Court by filing a counterclaim, and did not reserve the right to contest jurisdiction. Exhibit A at p. 29. At all relevant times, Intier has engaged in placing the defective parts into the stream of

commerce, such that the door latches arrived in Massachusetts in defective condition. Moreover, Intier advertises its business and services in several publications that are circulated in Massachusetts. *See*, Exhibits C through F. Given the weight of these various contacts, it would not violate due process to assert general jurisdiction over Intier in Massachusetts. Intier can hardly be surprised to be hailed into court in this forum, given the continuous and substantial nature of its contacts, and its previous litigation in the forum. Therefore, this Court should exercise general jurisdiction over Intier.

> **b.    Intier Has Sufficient Minimum Contacts With Massachusetts To Support The Exercise Of Specific Jurisdiction In This Forum.**

In the unlikely event that it is determined that Intier's contacts do not suffice for general personal jurisdiction, those same contacts should nonetheless be more than sufficient to assert specific personal jurisdiction over the defendants. In the absence of general jurisdiction, the power of a federal court sitting in Massachusetts depends upon the existence of specific jurisdiction. In order to establish personal jurisdiction by way of specific jurisdiction, it must be shown that the Massachusetts long-arm statute grants jurisdiction and, if it does, that the existence of jurisdiction under the statute is consistent with the United States Constitution. *Brown Rudnick*, 311 F.Supp.2d 131. The First Circuit has developed a three-part test for deciding whether exercising specific jurisdiction over a defendant comports with due process:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*Milford Power Ltd. P'Ship. v. New England Power Co.*, 918 F.Supp. 471, 480 (D.Mass. 1996)

This claim arises out of Intier's purchasing door latch parts from Massachusetts, incorporating those same parts into defective door latch assemblies and placing those latch assemblies into the stream of commerce where they arrived in Massachusetts in Ford vehicles. Accordingly, the plaintiffs satisfy these jurisdictional elements via the application of the stream of commerce theory of specific jurisdiction.

The First Circuit is the only circuit to adopt Justice O'Connor's plurality opinion from *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102 (1987), wherein she said that "the placement of a product into the stream of commerce, *without more,* is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market .... But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." *Asahi,* 480 U.S. at 112 (emphasis added). The clear implication from the foregoing is that where, as here, the defendant's conduct consists of *more* than merely placing a product into the stream of commerce, it may well be subject to specific personal jurisdiction in Massachusetts.

The Defendants contend that "Intier ... did not manufacture, distribute, or sell the door latches, and therefore did not place them into the stream of commerce at all." Def. Memo, p.15. It bears repeating that these claims are flatly contradicted by documents filed with this Court that unequivocally indicate that Intier did indeed "admit[ed] that it is an automotive supplier engaged in the design, manufacture and supply of automotive closure systems, components and parts." Exhibit B, ¶ 9. Specifically, Intier "admit[ed] that is has assembled Stoneridge's ADLA products together with other parts to create a door latch and power lock assembly, and that it has sold and still sells assemblies to Ford." *Id.* at ¶ 13.

Intier has availed itself of the protection of laws of the forum in numerous ways sufficient to satisfy the 'stream of commerce' plus the "something more" theory of specific jurisdiction adopted by the First Circuit. Intier has advertised its business and services in Massachusetts, has a member of its Board of Directors based in Massachusetts and has engaged in business transactions in Massachusetts. Intier entered into contracts with Stoneridge to provide Intier with the components that were shipped from Massachusetts to Intier's factories, assembled into door latches, sold to Ford, incorporated in Ford vehicles that were then sold to consumers in Massachusetts. Intier was assuredly aware that by providing door latch components to Ford, its parts were going to end up back in Massachusetts. Conducting business in Massachusetts in the form of acquiring parts that would later be incorporated in the Ford vehicles and returned to Massachusetts is evidence of "additional conduct of the defendant ... indicat[ive of] an intent or purpose to serve the market in the forum State." *Asahi*, 480 U.S. at 112. Moreover, as mentioned above, when Intier was sued under the contract it entered into with Stoneridge, it also availed itself of the forum's laws by filing counterclaims against Stoneridge. Exhibit A. Lastly, Intier clearly intended to serve the market in Massachusetts as it advertises its business and services in various publications sold and circulated in the Commonwealth. *See*, Exhibits C through F. Hence, Intier has availed itself of the laws of the forum beyond merely placing the defective products into the stream of commerce and, as such, this Court should exercise specific jurisdiction over Intier.

Lastly, it would hardly offend the "traditional notions of fair play and substantial justice" to require Intier to defend a suit in Massachusetts. *Asahi*, 480 U.S. at 113. It would be no more burdensome on Intier to require them to litigate this matter than it was in the *Stoneridge* case which was only resolved three months ago. In addition, it is patently false to assert that none of the relevant witnesses may be found in Massachusetts because Stoneridge, as a manufacturer of

18

component parts incorporated into the defective door latch assemblies at issue in this case, is based in Massachusetts. As always, Massachusetts continues to have a great interest in obtaining relief for its citizens arising from the manufacture and sale of defective products. Finally, Intier has indeed been subjected to claims and has subjected others to claims in this very forum. Therefore, due process will not be violated by this Court's exercise of specific personal jurisdiction over Intier.

**B.    In The Alternative, Jurisdictional Discovery Is Appropriate.**

If the court finds Plaintiffs failed to make made a sufficient showing to exercise jurisdiction over Intier, Plaintiffs request that the court allow limited jurisdictional discovery to ascertain more about Intier's business and other contacts with Massachusetts. Massachusetts courts have "held consistently to the rule that a plaintiff may take jurisdictional discovery if its claim is 'colorable.'" *Sunview Condo. Ass'n v. Flexel Int'l, Ltd.,* 116 F.3d 962, 964 (1st Cir.1997). This standard for obtaining discovery "requires some showing that discovery is needed or likely to be useful." *U.S. v. Swiss Am. Bank, Ltd.,* 274 F.3d 610, *637 (1st Cir. 2001). Nonetheless, such a showing is "significantly lower than the prima facie showing of jurisdiction, which requires the plaintiff 'to demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution.'" *Id.* Accordingly, a "diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of in personam jurisdiction may well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense." *Sunview Condo. Ass'n v. Flexel Int'l., Ltd.,* 116 F.3d 962 (1st Cir. 1997). Jurisdictional discovery is appropriate "where the plaintiff had been diligent and was somewhat unfamiliar with his adversary's business practices," *Boit,* 967 F.2d at 681, and "where complex factual matters are in question," *Whittaker Corp.,* 482 F.2d at 1086. Given the obfuscation by Intier of its dealings with and in Massachusetts, if the court finds insufficient evidence to support the

exercise of personal jurisdiction over Intier at this time, allowing the Plaintiffs to conduct limited jurisdictional discovery is assuredly appropriate.

**IV.    Conclusion**

The Massachusetts long-arm statute authorizes the exercise of personal jurisdiction of Intier in this forum, and the exercise of such jurisdiction would be constitutionally permissible based on Intier's business and professional contacts within the state, its purposeful availment of the forum's courts, and its placing products into the stream of commerce.  As such, Plaintiffs respectfully request that the Court deny Intier's 12(b)(2) Motion to Dismiss for lack of personal jurisdiction.

WHEREFORE, for the foregoing the Plaintiffs respectfully request that this Honorable Court deny Intier's Motion to Dismiss.

DATED: June 27, 2005

Respectfully submitted,
by Plaintiffs' attorneys,

David C. Strouss, Esq.  BBO# 546253
Kristen Marquis Fritz, Esq.  BBO# 650886
**THORNTON & NAUMES**
100 Summer Street - 30th Floor
Boston, MA 02110
(617) 720-1333

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STONERIDGE CONTROL DEVICES, INC.,  )
              Plaintiff           )
                            )
                            )     CIVIL ACTION NO. 02-CV-10803
                            )
v.                           )     Hon. Joseph L. Tauro
                            )
INTIER AUTOMOTIVE CLOSURES,    )
              Defendant.      )

**INTIER AUTOMOTIVE CLOSURES'S ANSWER TO THE AMENDED COMPLAINT,
COUNTERCLAIMS AND DEMAND FOR TRIAL BY JURY ON ALL CLAIMS AND
COUNTERCLAIMS SO TRIABLE**

PARTIES AND JURISDICTION

1.      Intier Automotive Closures Inc. ("Intier") lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 1 and therefore denies the same.

2.      Intier lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 2 and therefore denies the same.

3.      Intier admits that the defendant named in the Amended Complaint is referred to as Intier Automotive Closures, but states that its correct name is Intier Automotive Closures Inc. For purposes of this Answer, however, Intier will assume that plaintiff is referring to the correct legal entity. With that assumption (which will also be made throughout), Intier admits the remaining allegations in Paragraph 3.

4.      Intier admits that Dortec Industries is a division of Intier, but states that the correct name is Dortec Industries, not Dortec Industries, Inc. Once again, Intier will assume for purposes of this Answer that Stoneridge is referring to Dortec Industries.

5.      Intier admits that the plaintiff purports that its claims involve an amount in controversy that exceeds $75,000.

6.      Intier admits that it is a corporation organized under the laws of the province of Ontario, Canada, and admits that the plaintiff purports to be a citizen of Massachusetts. The remaining allegations in Paragraph 6 state legal conclusions to which no response is necessary.

7.      The allegations in Paragraph 7 state legal conclusions to which no response is necessary.

NATURE OF THE ACTION

8.      Intier admits that the plaintiff purports to seek damages for the claims listed in Paragraph 8, but Intier denies that any of those claims has any merit and denies that it is liable for any damages.

GENERAL ALLEGATIONS

*The Relationship and Contractual Agreements Between Stoneridge and Intier*

9.      Intier admits that it is an automotive supplier engaged in the design, manufacture and supply of automotive closure systems, components and parts. Intier denies any remaining allegations in Paragraph 9.

10.     On information and belief, Intier admits the allegations in Paragraph 10.

11.     On information and belief, Intier admits the allegations in Paragraph 11.

12.     Intier admits that Kelsey-Hayes and Intier began discussing the possibility of Kelsey-Hayes designing ADLA parts for Intier in 1993. Intier denies that ADLA products are "unique" components. Intier admits that the term "ADLA" is interchangeable with the terms "power adjunct actuators" and "D21 adjunct actuators" supplied by Stoneridge to Dortec, but denies that it is interchangeable with "D21 latches" and "D21 latching systems with power lock and unlock feature," since such latches and systems include more than the referenced actuators.

2

For purposes of this Answer, Intier will assume that the term ADLA refers to actuators and not the latching systems that include such actuators. Intier denies any remaining allegations in Paragraph 12.

13.     Intier lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 13 and therefore denies the same. Intier further states that the allegations in Paragraph 13 are vague and indefinite as to timeframe and vague as to what product or component is being referenced.

14.     Intier admits that it has assembled Stoneridge's ADLA products together with other parts to create a door latch and power lock assembly and that it has sold and still sells assemblies to Ford, but denies that it continues to use Stoneridge parts. Intier lacks knowledge or information as to what Stoneridge means by "this type of power door lock assembly" and therefore denies all remaining allegations of Paragraph 14.

15.     Intier denies that ADLA supplied by Stoneridge to Intier are currently used in new Ford vehicles. Intier lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 15 and therefore denies the same.

16.     Intier admits that Kelsey-Hayes sent Intier a letter dated June 13, 1995, in which Kelsey-Hayes stated in part that: "As the annual volume approaches 6,000,000 units or more we now see the possibility to hit a $4.03 - $4.05 price level if the business were sourced on a 100% long term basis with Kelsey-Hayes." Intier further states that Kelsey-Hayes stated in the letter that it was not yet submitting a formal supply proposal but rather providing "an update based on our latest view." Intier admits that a true and accurate copy of the letter was attached as Exhibit A to the Amended Complaint. Intier denies that the letter represents an agreement of the parties and denies any allegations in Paragraph 16 that are inconsistent with the document itself.

3

17.     Intier admits that it sent a letter to Kelsey-Hayes, dated August 17, 1995, which stated in part that "the decision was made by both Ford and Dortec to source Kelsey Hayes for the D21 Power Adjunct Actuator."   Intier admits that a true and accurate copy of the letter was attached as Exhibit B to the Amended Complaint.  Intier denies that the letter stated that Ford and Intier chose Kelsey-Hayes as "the supplier of ADLA to Intier" and any other allegations in Paragraph 17 that are inconsistent with the document itself.

18.     Intier admits that it provided Kelsey-Hayes a copy of an Intier document dated September 25, 1995, but denies the accuracy of the characterization of the document in Paragraph 18.  Intier admits that the document states in part that "Kelsey-Hayes responsibilities must include: ... Production to support all current and projected future volumes of D21 latching systems with power lock and unlock feature, starting with 98 Model Year."  Intier admits that a true and accurate copy of the letter was attached as Exhibit C to the Amended Complaint.  Intier denies the remaining allegations in Paragraph 18.

19.     Intier admits that Kelsey-Hayes sent Intier a letter and quotation dated October 25, 1995, and that the letter stated in part that "this quotation offer is subject to Kelsey-Hayes being awarded 100% of the D21 Adjunct Power Actuator business volume."   Intier admits that a true and accurate copy of the letter was attached as Exhibit D to the Amended Complaint.  Intier denies Stoneridge's characterization of the letter and denies any allegations in Paragraph 19 that are inconsistent with the document itself.

20.     Intier lacks knowledge or information sufficient to form a belief as to the scope of Stoneridge's acquisition and therefore denies the allegations in Paragraph 20 related to it, but Intier admits that Intier dealt with Stoneridge after dealing with Kelsey-Hayes.

21.    Intier admits that Stoneridge made price proposals to Intier in October,
November, and December of 1996, and that the proposals stated in part, on a page listing
platform volume assumptions, that "Platform Actuator requirements must be 100% sourced to
[Stoneridge]," but Intier denies any allegations in Paragraph 21 that are inconsistent with the
documents themselves. Intier lacks knowledge or information sufficient to form a belief as how
Stoneridge came to its calculations but denies any understanding that Stoneridge would be the
exclusive life time supplier of ADLA to Intier. Intier admits that a true and accurate copy of
portions of proposals was attached as Exhibit E to the Amended Complaint. Intier denies any
remaining allegations in Paragraph 21.

22.    Intier admits that a true and accurate copy of the December 2, 1996 letter and the
April 17, 1996 letter were attached as Exhibit F to the Amended Complaint, along with a
document purporting to be page 4 of a letter dated October 25, 1995, and a Request for
Quotation dated April 17, 1996. Intier denies any allegations in Paragraph 22 that are
inconsistent with the documents themselves.

23.    Intier denies the allegations in Paragraph 23.

24.    Intier denies the allegations in Paragraph 24. Intier admits that a true and accurate
copy of the letter referenced in the paragraph was attached as Exhibit G to the Amended
Complaint.

25.    Intier admits that it sent Stoneridge a document called "Purchasing
Memorandum," dated December 11, 1996, which states in part that "The current negotiated
tooling agreement with Ford Purchasing and the VC's follows: Piece price: The negotiated price
between [Intier] and [Stoneridge] of $4.49 per actuator was accepted." Intier admits that a true
and accurate copy of the memorandum was attached as Exhibit H to the Amended Complaint.

Intier denies that the document represents an agreement between the parties, denies Stoneridge's characterization of this document and denies any allegations in Paragraph 25 that are inconsistent with the document itself.

26.    Intier denies the allegations in Paragraph 26.

27.    Intier denies the allegations in Paragraph 27.

28.    Intier admits that the 2002 model year ended on July 31, 2002, admits that the parties met on July 17, 1997 to negotiate a Long Term Agreement ("LTA") and admits that the parties entered into a LTA governing ADLA sales from Stoneridge to Intier, which expired by its own terms on July 31, 2002. Intier admits that a true and accurate copy of the LTA was attached as Exhibit I to the Amended Complaint, but denies the remaining allegations in Paragraph 28.

29.    Intier admits that it exchanged subsequent drafts of the LTA with Stoneridge after July 17, 1997. Intier admits that true and accurate copies of letters from Intier dated April 8, 1998 and May 7, 1998, excluding the enclosures, were attached as Exhibits J and K to the Amended Complaint. Intier admits that it notified Stoneridge by letter dated February 13, 2002 that it would not be extending the LTA beyond its expiration on July 31, 2002. Intier denies the remaining allegations in Paragraph 29.

30.    Intier admits the allegations in Paragraph 30.

31.    Intier admits that Stoneridge sent a letter dated September 29, 1998, which states both that it is "a quote for the 2001 U152 Actuators" on page 1, and states "Quote is based on a five year (minimum) production cycle for Actuators" on page 4. Intier admits that a true and accurate copy of the letter was attached as Exhibit L to the Amended Complaint. Intier denies that the U152 is solely for the Ford Explorer, denies the remaining allegations in Paragraph 31 and denies any allegations inconsistent with the document itself.

6

32.     Intier admits that it agreed to purchase certain U152 ADLA from Stoneridge.
Intier further admits that a Statement of Work was signed by Dortec on November 18, 1998, and
that one of the "Program Assumptions" listed on the document is "Program Life: 7 Years."
Intier also admits that a true and accurate copy was attached as Exhibit M to the Amended
Complaint. Intier denies the remaining allegations of Paragraph 32 and denies any allegations
inconsistent with the document itself.

33.     Intier denies the allegations in Paragraph 33.

34.     Intier admits that a copy of an undated document entitled "ADLA Pricing for
Standard & Rotated Connector Designs U152 Tooling & Timing" was attached as Exhibit N to
the Amended Complaint. Intier also admits that the document states under the heading "Terms
and Conditions," in part, "2. Quote is based on a five year minimum volume purchase agreement
of 9M ADLA's w/ Rotated Connector; otherwise, cancellation charges apply." Intier further
admits that it issued a purchase order for U152 actuators. Intier denies the remaining allegations
in Paragraph 34 and denies any allegations inconsistent with the document itself.

35.     Intier denies that the M205 was intended to be a "modified ADLA" in February of
1999, but admits the remaining allegations in Paragraph 35.

36.     Intier denies the allegations in Paragraph 36.

37.     Intier admits that a copy of an e-mail from Brenda Price to Maureen Taliaferro
was attached as Exhibit O to the Amended Complaint. Intier admits the e-mail is dated February
19, 1999, and states in part that "This is to notify Pollak, A Stoneridge Company that your
actuator assembly, Dortec P/N R10098/9 has been selected as the product to be utilized for the

7

M205 and U137 programs." Intier also admits that the same e-mail states "The Statement of Work remains as is currently negotiated with the U152 program." Intier denies the remaining allegations in Paragraph 37.

38.     Intier admits that a faxed document was attached as Exhibit P to the Amended Complaint, which states in part: "What do we want?", and states "4. Explain that we are NOT going to insource actuator production." Intier denies the remaining allegations in Paragraph 38.

39.     Intier admits that a copy of a Purchase Order dated August 9, 1999 was attached as Exhibit Q to the Amended Complaint. Intier also admits that the August 9, 1999 document states under "Terms & Conditions," "In the event that a Long Term Agreement (LTA)/Statement of Work (SOW)/Early Sourcing Target Agreement (ESTA) has been signed by said organization, the terms and conditions contained therein apply." Intier denies the remaining allegations of Paragraph 39.

40.     Intier admits that a copy of an e-mail dated December 13, 1999 from Eleonora Favelyukis to Maureen Taliaferro was attached as Exhibit R of the Amended Complaint. Intier admits that the e-mail states in part: "Please be advised that Ford has awarded the U222/228 program to Dortec. The U222/228 systems include D21 latch with adjunct actuator. Pollak has been confirmed as the source of the Adjunct actuator for this program." Intier denies the remaining allegations of Paragraph 40.

41.     Intier denies the allegations in Paragraph 41.

42.     Intier denies the allegations in Paragraph 42.

*Intier's Misrepresentations*

43.     Intier denies the allegations in Paragraph 43.

8

44.    Intier lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 44 and therefore denies the same.

45.    Intier admits that a copy of a letter from Intier to Stoneridge dated August 29, 2000 was attached as Exhibit S to the Amended Complaint.  Intier admits that the letter states "We are in receipt and have reviewed your letter dated August 15, 2000, outlining LDM Supply Situation.  Please be advised that Atoma cannot accept your proposed premium rates nor can we accept any supply disruptions of actuators from Pollak to Atoma.  While we share your concerns, this is an issue between Pollak and LDM that needs to be resolved quickly; securing our continuous source of supply depends on it."  Intier denies the remaining allegations in Paragraph 45.

46.    Intier admits that a letter from Stoneridge to Intier dated September 14, 2000 was attached as Exhibit T to the Amended Complaint.  Intier admits that the letter states, among other things: "There are several paths, which Stoneridge is currently pursuing in an effort to resolve adequate supply of ADLA components from LDM.  First, Stoneridge is currently working on a long-term plan for an alternative supply source for the adjunct actuator components.  Stoneridge is incurring considerable costs to accomplish this task in the interest of protecting our supply to meet your needs."  Intier denies the remaining allegations in Paragraph 46.

47.    Intier denies the allegations in Paragraph 47.

48.    Intier lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 48 and therefore denies the same.

49.    Intier admits that it has designed its own actuator that it now intends to use in its power door lock assemblies for Ford, but denies that it made any representations to the contrary and denies the remaining allegations of Paragraph 49.

9

50.    Intier admits that a copy of a letter from Intier to Stoneridge dated February 13, 2002 was attached as Exhibit U to the Amended Complaint.  Intier denies Stoneridge's characterization of the letter, but admits that the letter stated that "Dortec has developed an actuator, which will directly replace Pollak's adjunct actuator.  As a result, please be advised that Dortec will not be extending our long-term agreement (LTA) with Pollak for actuators beyond the agreement's expiry date of July 31, 2002."  Intier denies the remaining allegations in Paragraph 50.

*Stoneridge's Trade Secrets and Proprietary Information*

51.    Intier denies that it began investigating the potential acquisition of Kelsey-Hayes' door lock device division in 1993, but admits that it began such an investigation in 1994.

52.    Intier admits that the automotive industry is competitive, but denies that all companies in the automotive industry must, as a consequence, protect their business information or that all such companies have trade secrets or confidential business information to protect.  Intier lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 52 and therefore denies the same.

53.    Intier admits that a copy of a nondisclosure agreement entered into between Kelsey-Hayes and Dortec on August 19, 1993 was attached as Exhibit V to the Amended Complaint.  Intier admits that the agreement expired after three years.  Intier admits that the agreement states that "Proprietary Information disclosed by the Disclosing Party to the Receiving Party shall be used by the Receiving Party solely for the purpose of evaluating the feasibility of a future business relationship with the Disclosing Party."  Intier further states that the agreement provides that "'Proprietary Information' shall, for the purpose of this Agreement, mean information disclosed by the Disclosing Party to the Receiving Party and identified in writing or

10

other tangible form at the time of disclosure, or within thirty (30) days of oral disclosure, as 'Proprietary,'" and also states "For information to qualify as Proprietary Information under this Agreement, the information itself, a copy of the Information, or a sample of the product, equipment or material to be disclosed, must be identified in writing, clearly marked 'Proprietary-Confidential' sufficient to identify such and must be directed at the time of submittal to the Receiving Party's designated representative, namely Alfred L. Portelli for Dortec . . . . All information furnished by the Disclosing Party to a Receiving Party that is not Proprietary Information is disclosed on a non-confidential basis without any restriction on the Receiving Party's right to use or disclose such information." Intier lacks knowledge or information sufficient to form a belief as to what Stoneridge and Kelsey-Hayes sought to do, and therefore denies the same. Intier denies any remaining allegations in Paragraph 53.

54.    Intier admits a true and accurate copy of a Confidentiality and Non-Disclosure Agreement between Kelsey-Hayes and Intier, signed on June 7, 1994, was attached as Exhibit W to the Amended Complaint.

55.    Intier admits the allegations in Paragraph 55 and admits that a true and accurate copy of the agreement was attached as Exhibit X to the Amended Complaint.

56.    Intier admits that U.S. Patent Nos. 5,855,130, DES374,599 and DES412,825 are related to actuators but lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 56 and therefore denies the same.

57.    Intier lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 57 and therefore denies the same.

58.     Intier admits that it informed Stoneridge on February 13, 2002 that it had developed an ADLA that would replace Stoneridge's ADLA and admits that a copy of this letter was attached as Exhibit U to the Amended Complaint. Intier denies the remaining allegations in Paragraph 58.

*Post July 31, 2002 Transactions*

59.     Intier admits the allegations in Paragraph 59.

60.     Intier denies the allegations in Paragraph 60.

61.     Intier admits that after July 31, 2002 Stoneridge supplied ADLAs to Intier. Intier lacks knowledge or information sufficient to form a belief as to when the ADLAs were produced. Intier denies the remaining allegations in Paragraph 61.

62.     Intier denies the allegations in Paragraph 62.

63.     Intier denies the allegations in Paragraph 63.

64.     Intier denies the allegations in Paragraph 64.

65.     Intier admits that Stoneridge has issued a cancellation invoice and admits that Intier has not paid the entirety of the invoiced amount but denies the remaining allegations in Paragraph 65.

COUNT I

(Breach of Contract)

66.     Intier repeats and incorporates by reference its responses to Paragraphs 1 through 65 as if fully set forth herein.

67.     On the understanding that Stoneridge's reference to "the July 31, 2002" in Paragraph 67 is meant to refer to the LTA, Intier admits the allegations in Paragraph 67.

12

68.     Intier admits that after July 31, 2002, it has used some of its own custom made actuators in the manufacture of door latches it has sold to Ford and admits the D21 latch program is ongoing.  Intier denies the remaining allegations in Paragraph 68.

69.     Intier denies the allegations in Paragraph 69.

70.     Intier denies the allegations in Paragraph 70.

COUNT II

(Misrepresentation)

71.     Intier repeats and incorporates by reference its responses to Paragraphs 1 through 70 as if fully set forth herein.

72.     Intier denies the allegations in Paragraph 72.

73.     Intier denies the allegations in Paragraph 73.

74.     Intier lacks knowledge or information sufficient to form a belief as to whether Stoneridge made investments and entered into long term agreements with LDM and GW Plastics and therefore denies the same.  Intier denies the remaining allegations in Paragraph 74.

75.     Intier denies the allegations in Paragraph 75.

COUNT III

(Promissory Estoppel)

76.     Intier repeats and incorporates by reference its responses to Paragraphs 1 through 75 as if fully set forth herein.

77.     Intier denies the allegations in Paragraph 77.

78.     Intier denies the allegations in Paragraph 78.

79.     Intier denies the allegations in Paragraph 79.

80.     Intier denies the allegations in Paragraph 80.

81.     Intier denies the allegations in Paragraph 81.

13

82.    Intier denies the allegations in Paragraph 82.

83.    Intier denies the allegations in Paragraph 83.

## COUNT IV

(Violation of and Unlawful Use of Trade Secrets and Proprietary Information)

84.    Intier repeats and incorporates by reference its responses to Paragraphs 1 through 83 as if fully set forth herein.

85.    Intier denies the allegations in Paragraph 85.

86.    Intier denies the allegations in Paragraph 86.

## COUNT V

(Violation of Mass. Gen. Laws c. 93A)

87.    Intier repeats and incorporates by reference its responses to Paragraphs 1 through 86 as if fully set forth herein.

88.    Intier lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 88 and therefore denies the same.

89.    Intier admits the allegations in Paragraph 89.

90.    The allegations of Paragraph 90 state legal conclusions as to which no response is necessary.  However, to the extent Stoneridge's allegations are understood, Intier denies the allegations in Paragraph 90.

91.    Intier denies the allegations in Paragraph 91.

92.    Intier denies the allegations in Paragraph 92.

## AFFIRMATIVE DEFENSES

1.    Certain of the relief that Stoneridge seeks is barred by the Statute of Frauds.

2.    Certain of the relief that Stoneridge seeks is barred by the Statute of Limitations.

3.      Certain of the relief that Stoneridge seeks is barred by the doctrine of unclean hands.

4.      The relief that Stoneridge seeks is barred in whole or in part by the doctrines of waiver and estoppel.

5.      The relief that Stoneridge seeks is barred in whole or in part due to Stoneridge's failure to mitigate its alleged damages.

6.      Stoneridge's claim that Intier breached a so-called lifetime contract is barred by the parties' entry into a Long Term Agreement ("LTA"), which constitutes an accord and satisfaction and/or subsequent modification of the alleged earlier agreement.

7.      Stoneridge's claim under Mass. Gen. L. ch. 93A is barred to the extent that the alleged unfair acts and practices did not occur primarily and substantially within Massachusetts.

## COUNTERCLAIMS

Intier counterclaims against Stoneridge and alleges as follows:

## PARTIES

1.      Counterclaim plaintiff Intier Automotive Closures Inc. ("Intier") is a corporation organized under the laws of the province of Ontario, Canada, with its principal place of business in Ontario, Canada.

2.      Counterclaim defendant Stoneridge Control Devices, Inc. ("Stoneridge") is a corporation organized under the laws of the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

3.      This Court has diversity jurisdiction of this action under 28 U.S.C. § 1332, as counterclaim plaintiff is a citizen of a foreign state, Canada, and counterclaim defendant is a

15

citizen of Massachusetts. The amount in controversy, exclusive of interest and costs, exceeds

$75,000. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367, as Intier's

counterclaims arise out of the same transaction and occurrence as claims alleged by Stoneridge

and are thus so related that they form part of the same case or controversy.

      4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

      5.      Intier, through its Dortec Industries division (hereinafter "Intier" and "Dortec" are

used interchangeably), is an automotive supplier engaged in the design, manufacture and supply

of automotive systems, components and parts.

      6.      Stoneridge, through its Pollak Actuator Products division (hereinafter

"Stoneridge" and "Pollak" are used interchangeably), engages in the manufacture and assembly

of automotive parts.

      7.      In or about 1993, Intier began discussions with Kelsey-Hayes Company regarding

the engineering of adjunct door lock actuators ("ADLAs") for Intier.

      8.      Upon information and belief, Stoneridge acquired at least some of Kelsey-Hayes'

business in November 1995 and thereafter replaced Kelsey-Hayes in its relationship with Intier.

Stoneridge and Intier subsequently engaged in negotiations for a Long Term Agreement ("LTA")

to govern their relationship regarding the purchase and sale of ADLAs.

      9.      On July 17, 1997, the parties met to continue their ongoing LTA negotiations.

There, Stoneridge indicated its assent to, among other things, the term of the draft LTA that

provides that the parties' agreement would be for a five year term. Specifically, the draft LTA

stated: "This Long Term Agreement sets forth the terms and conditions under which Dortec

Industries (Buyer), a division of Atoma International shall purchase from Pollak Engineered

Production Actuator Division (Seller), actuator assemblies beginning 1998 model year through 2002 model year inclusive." Because the 2002 model year ends on July 31, 2002, the LTA that was the subject of discussion at the July 17, 1997 meeting expressly provided that the parties' agreement would expire on July 31, 2002.

10.    After the July 17, 1997 meeting, Stoneridge asserted that the LTA had been finalized on July 17, 1997. Thus, for example, on April 1, 1998, Stoneridge sent a letter to Intier stating that the LTA had been finalized: "This letter is to confirm that Pollak Actuator Products Division is currently operating under the terms of the Long Term Agreement as negotiated and settled with you on July 17, 1997. The subject LTA has a protracted history between our companies dating back to November 1995 but, as you will recall, the negotiated LTA terms were finally settled with our handshake agreement in New Market on July 17 and subsequently confirmed by Brenda Price in her July 18, 1997 letter." The letter also referred to the distribution of cost savings in the LTA as an "extra concession" made by Stoneridge in recognition that the LTA joined the parties in a long term relationship: "The intent of the 'extra' concession was to demonstrate our partnership goodwill toward Dortec given that we were consummating a long term business contract." The letter does not reference any supposed earlier long term agreement between the parties and indeed suggests the contrary.

11.    On April 8, 1998, Intier sent a letter to Stoneridge, making clear its position that "the LTA is still in draft, and is not and will not be in full force and effect until it is fully executed by the parties. Once executed in its final form, the agreement will be effective as and from the beginning of the 1998 model year (i.e. Aug. 1, 1997). Until that time, the parties are being governed by the Purchase Order issued by Dortec Industries dated Nov. 10, 1997 to Pollak."

12.    On May 7, 1998, Intier sent a letter to Stoneridge with an updated LTA proposal. The letter reiterated that: "The meeting held on July 17, 1997, between Dortec and Pollak, while in relation to the LTA, certainly did not finalize the LTA, as there have been several ongoing items that both sides have diligently been attempting to resolve." The letter further explained:

> The current wording, which has not changed since the original draft of the LTA's inception, states 'This agreement will cover 100% of Seller's Linear Door Lock Actuator, Adjunct Door Lock Actuator or any other actuator supplied to Buyer over the course of each model year.' The interpretation by Pollak may have been that Pollak produce 100% of the adjunct power door lock actuators for Dortec's D21 latch, however, our position is stated in the LTA clearly that the agreement covers 100% of Seller's actuators. This does not mean that 100% of Dortec's actuator requirements are to be supplied by Pollak. As you requested, we have removed 'Buyer shall be entitled to source actuators internally, from Buyers affiliates' from this paragraph but have left in 'accordance with requirements of Buyers customer', which simply reflects the reality of our industry. There is no provision in the LTA to source 100% of the actuators from Pollak on a long-term basis. This has not been agreed to verbally or in writing.

13.    Although Stoneridge was well aware of Intier's view that the parties' relationship was governed by Purchase Orders, Stoneridge did not inform Intier that it believed that the parties had reached an agreement before July 17, 1997 (or at any other time) pursuant to which Intier was obligated to purchase 100% of its actuators from Stoneridge for the lifetime of its ADLA programs ("lifetime agreement").

14.    Quite the contrary, as the expiration of the LTA approached, Stoneridge repeatedly acknowledged the need to negotiate a new LTA to replace the one that was to expire in July 2002. For example, in a letter dated December 12, 2000, Stoneridge's Steven Syzdek advised Dortec's Marie Balance: "Given the 5-year term of the LTA, we have now less than 19 months remaining until a new agreement is formulated."

15.    After the parties were unable to agree on a mutually acceptable price for a new LTA, Intier sent Stoneridge a letter, dated February 13, 2002, informing it that the LTA would not be extended beyond its expiration of July 31, 2002.

16.    On May 2, 2002, Stoneridge filed its initial Complaint in this action, alleging that the parties had entered into an agreement for Stoneridge to supply all ADLAs required by Intier for the lifetimes of the various ADLA programs.  No such agreement was attached to the Complaint and Stoneridge did not explain when and how this agreement was supposedly reached.

17.    On November 12, 2002, Stoneridge filed an Amended Complaint.  There, Stoneridge alleged, among other things, that in a February 13, 2002 letter, "Intier informed Stoneridge that it would not continue to purchase ADLA parts from Stoneridge . . . for any program after July 31, 2002."  (Am. Compl. ¶ 68, emphasis added.)

18.    Intier's February 13, 2002 letter, however, contained no such statement.  Rather, it stated that "[an]y Dortec requirement for Pollak adjunct actuators after the LTA expiry date will therefore be governed by the terms of Dortec's Purchase Order and will be reflected through our releases."

19.    Throughout the parties' course of dealing, Stoneridge recognized that Intier could not afford any disruption in the supply of parts to its ultimate customer, the Ford Motor Company.  Thus, after July 31, 2002, when Intier did not have sufficient parts for Ford and attempted to order additional ADLAs from Stoneridge, Stoneridge attempted to exploit Intier's vulnerability by extracting higher prices and imposing additional charges beyond what the parties had agreed to earlier.

19

20.     In letters to Intier dated May 14, 2002 and June 5, 2002, Stoneridge asserted that

the expiration of the LTA on July 31, 2002 only impacted prices for "standard" ADLA units

while "[p]rices for all other ADLA products will remain as previously negotiated under the

supply agreements and purchase orders for these products." The May 14 and June 5

correspondence thus specifically stated that prices for non-standard ADLAs, such as U152 and

M205 actuators, would remain *as previously negotiated*. The following are excerpts from

Stoneridge's May 14 and June 5, 2002 correspondence with Intier:

- May 14, 2002 – "In view of Dortec's termination of our supply agreements and the July 31, 2002 expiration of the [LTA], beginning on August 1, 2002, the price for standard ADLA products will revert to the price in effect before the LTA, which is $4.465 per unit. *** *Prices for all other products will remain as previously negotiated under the supply agreements and purchase orders for these products....*" The price given for U152 actuators was the same as on the blanket purchase order:  $4.21. (emphasis added)

- June 5, 2002 – "Price for standard ADLA products will revert to the price in effect before the LTA, which is $4.465 per unit. *** *Prices for all other ADLA products will remain as previously negotiated under the supply agreements and purchase orders for these products....*" The price given for U152 actuators was the same as on the blanket purchase order:  $4.21. (emphasis added)

21.     Later, however, after detecting Intier's vulnerability, Stoneridge attempted to

extract premium prices and impose fictitious costs for the sale of non-standard ADLAs.

22.     In an effort to obtain a price quote for a potential order of ADLAs, Darrel

Godlington of Dortec sent an e-mail to Stoneridge at approximately 2:19 p.m. Thursday,

September 12, 2002, regarding Intier's requirements for two types of ADLAs:  U152 actuators

(for shipments from October 7, 2002 to the end of December 2002) and M205 actuators (for

shipments from October 7, 2002 to February 17, 2003).  During the morning of Friday,

September 13, 2002, Godlington advised Stoneridge employees Maureen Taliaferro and Eva

Casamento in telephone conversations that his e-mail from the previous day had been a mere

inquiry, not a request for the purchase of ADLAs. In addition, at 12:12 p.m. on September 13,
Godlington followed up by sending an e-mail to Stoneridge that confirmed the nature of his
September 12 *inquiry*.

23.     Notwithstanding this, Stoneridge sent Intier an e-mail at 12:28 p.m. on September
13, 2002 "confirming" Intier's "urgent need for delivery" and stating that Stoneridge has "acted
upon your production release schedule in an expedited mode . . . to satisfy the delivery schedule
as outlined in your e-mail." Stoneridge further stated that as to the U152 actuators, "We will
need additional time to confirm the delivery schedule and premium expense to complete this
production and delivery and we should be able to provide you with better information sometime
next week."

24.     On Monday, September 16, 2002, after reviewing Stoneridge's September 13 e-
mail, Godlington sent another e-mail to Stoneridge stating that Intier would move forward with
the issuance of releases for the purchase of the M205 actuators. Godlington also wrote, however,
that "[w]ith respect to U152 actuators, as per my e-mail and conversations with [Stoneridge
employees] Maureen Taliaferro and Eva Casamento on Friday and today, please continue to treat
this as an inquiry only."

25.     Stoneridge responded on September 16, 2002, stating that Stoneridge is
"concerned with your revised statement regarding U152 ADLA requirements . . . . [Stoneridge]
has committed the full requirement of your U152 release for materials." Stoneridge conveyed
that it was "committed beyond return at this point."

26.     On September 18, 2002, Stoneridge informed Intier that it owed cancellation
charges totaling $265,500, allegedly stemming from Intier's September 12 order of U152
actuators and subsequent cancellation less than one day later. Stoneridge further notified Intier

21

that premium charges of $0.85 per unit would be assessed for purchase orders relating to U152 actuators. Stoneridge also declined to proceed with Intier's U152 ADLA request (for a smaller quantity than the initial inquiry) until receipt of payment of the premium and cancellation charges and stated that if U152 actuators were not purchased at the premium price of $5.06 per unit, full cancellation damages of $314,280 would be assessed to Intier.

27.    Intier confirmed its U152 ADLA order on September 19, 2002 and requested a "complete breakdown" of premium charges. Intier further stated that it did not believe Stoneridge's cancellation claim to be valid since Stoneridge had not provided "a detailed breakdown and justification of such claim."

28.    Stoneridge responded on September 19, 2002 that it was "not willing to provide Dortec justification of the premium and cancellation costs" and would not move forward with Intier's ADLA request without a purchase order reflecting premium and cancellation charges before the close of business that same day.

29.    Intier informed Stoneridge later on September 19, 2002 that Intier had blanket purchase orders in effect with Stoneridge and that Stoneridge's demand of a unilateral price increase and cancellation charge constituted "material violations" of the terms of the purchase orders.

30.    Stoneridge replied on September 20, 2002 with a letter stating that Intier could "mitigate damages . . . by [1] issuing a spot buy purchase order" to cover the requirements Godlington set forth in his September 12 price inquiry or "[2] issuing a spot buy purchase order" to cover premium costs of $.85 per unit and cancellation charges of $265,500. Stoneridge gave Intier until 3 p.m. that day to issue such a purchase order.

22

31.     Because Intier did not want to risk disrupting the supply of automotive parts to its ultimate customer, the Ford Motor Company, Intier concluded that it had no real choice but to relent to Stoneridge's unreasonable demand that it pay cancellation charges, with the proviso that Stoneridge would have to provide "legitimate documentary support" for such charges and that the charges would have to be validated through an audit.  Intier conveyed this in a letter to Stoneridge on September 20, 2002, and further indicated that it would be willing to work on an expedited basis to audit Stoneridge's claim.

32.     Stoneridge responded that Intier's letter was not received until 3:11 p.m. on September 20, 2002, eleven minutes after Stoneridge's stated deadline, and declined to accept Intier's "terms and conditions" for audit justification of the premium and cancellation charges.

33.     On October 11, 2002, Stoneridge sent Intier a cancellation claim letter and invoice for $223,361.79 in alleged damages.

34.     On October 17, 2002, Intier sent Stoneridge a letter requesting an audit on October 18, 2002 pursuant to the terms of the blanket purchase orders and sections 6.13 and 6.14 of the Dortec Supplier Manual.

35.     Stoneridge refused to grant Intier an audit on October 18 and stated, in stark contrast to its assertions in correspondence dated May 14, 2002 and June 5, 2002 (see supra ¶ 21), that Purchase Orders 60101 and 60102, which related to *non*-standard ADLAs, were not effective after the LTA's expiration date of July 31, 2002.  (Letters from Stoneridge to Intier of Oct. 18, 2002 and Oct. 25, 2002.)  Stoneridge did propose, however, that Intier submit a list of all information required for audit verification by October 22, 2002.

23

36.     On October 22, 2002, Intier pointed out Stoneridge's inconsistent positions on the effect of the purchase orders after the LTA's July 31, 2002 expiration and, in the spirit of trying to move the audit process forward, provided Stoneridge with a nonexhaustive list of required documentation regarding the cancellation fee.

37.     Intier conducted an audit at Stoneridge's premises on November 6, 2002, and determined that many (if not all) of Stoneridge's alleged cancellation costs were unfounded and/or unsupported.

38.     On November 22, 2002, Intier requested a price quotation for standard ADLA units.  Stoneridge provided a price quotation, but stated in its November 27, 2002 correspondence that no additional orders would be processed until resolution of the U152 cancellation claim.  Stoneridge offered to reduce the cancellation charge by up to $21,652.42 if Intier placed the new standard ADLA order.

39.     Intier provided Stoneridge with an audit assessment on December 4, 2002, which detailed the cancellation costs that were either unfounded or could not be processed because of lack of supportable documentation.

40.     Stoneridge responded on December 6, 2002 by stating that it would require payment of at least *one half* of the $223,361.78 cancellation charges in order to process Intier's standard ADLA order.

41.     On December 10, 2002, Intier objected to the payment of half of the cancellation costs in light of the facts that Intier provided Stoneridge with a detailed analysis of the audit findings and Stoneridge had not addressed that analysis.

42.     Stoneridge responded to Intier's audit assessment on December 10, 2002, rejecting Intier's "audit conclusions in their entirety."

24

43.     Intier sent Stoneridge a letter dated December 12, 2002 expressing dismay at Stoneridge's response to Intier's audit findings. However, for the sole purpose of satisfying Intier's customer (the Ford Motor Company) with the additional required standard ADLA parts, Intier reluctantly agreed to pay one-half of the U152 cancellation claim, but indicated that such payment "**would not** in any way constitute an admission by Dortec that such amount is owing to Stoneridge." Intier also advised Stoneridge that it reserved the right to pursue a counterclaim in the parties' ongoing litigation to seek reimbursement of this payment.

## COUNTERCLAIM I

### (Misrepresentation)

44.     Intier realleges and incorporates herein by reference the allegations of Paragraphs 1 through 43 as though fully set forth herein.

45.     Stoneridge claims that it believed, and continues to believe, that the parties entered into a lifetime agreement for the supply of actuators. Yet, Stoneridge did not disclose this belief to Intier before the parties entered into the LTA and/or various POs. To the contrary, Stoneridge represented that the parties were entering into, and later that they had entered into, a deal of fixed duration -- a five year agreement that would expire on July 31, 2002. Nor did Stoneridge advise Intier otherwise until after Intier advised Stoneridge on February 13, 2002 that it would not be renewing the LTA after it expired on July 31, 2002.

46.     In reasonable reliance on Stoneridge's misrepresentations and omissions, Intier agreed to purchase ADLAs from Stoneridge through July 31, 2002 and further agreed to pricing for standard ADLAs higher than it would have agreed to if the parties' agreement were for a longer period or for the lifetime of the ADLA programs. Had the deal been a longer term or a

25

lifetime agreement, Intier would have demanded deeper discounts and rebates as well as discounts and rebates that applied to all actuators sold by Stoneridge to Intier throughout the whole term of the parties' agreement.

47.    In reasonable reliance on Stoneridge's misrepresentations, Intier sourced various non-standard actuators from Stoneridge, and agreed to pricing higher than it would have agreed to if the parties' agreements were for Stoneridge to be the supplier of non-standard actuators for the lifetime of the programs. Again, under that scenario Intier would have demanded steeper discounts and rebates which applied throughout the whole term of the parties' agreement.

48.    Stoneridge also misrepresented that Intier's September 12, 2002 price inquiry and subsequent communications on September 13, 2002 confirming the nature of the September 12 inquiry caused Stoneridge to be "committed beyond return" to the production of a certain number of U152 actuators. In addition, Stoneridge misrepresented the premium and cancellation costs resulting from Intier's alleged cancellation of the September 12, 2002 order less than one day later.

49.    Stoneridge's knowingly false misrepresentations were of material facts and Stoneridge intended that Intier rely upon those misrepresentations. In addition, to the extent Stoneridge truly believed that it had entered into a lifetime agreement with Intier but did not disclose this belief during the parties' negotiations and business venture, Stoneridge intentionally omitted to disclose a material fact, rendering its other representations false and misleading.

50.    In reliance upon Stoneridge's misrepresentations and omissions, Intier has sustained substantial damages and Stoneridge has been unjustly enriched. Intier's damages

include payment of half the cancellation costs, expenses incurred for the audit of the alleged cancellation costs, and attorneys' fees and costs. Stoneridge's unjust enrichment includes its profits on the sale of actuators to Intier.

## COUNTERCLAIM II

### (Unjust Enrichment)

51.    Intier realleges and incorporates herein by reference the allegations of Paragraphs 1 through 50 as though fully set forth herein.

52.    Stoneridge falsely claimed that it had incurred cancellation charges of $265,500 in less than one day, stemming from Intier's September 12, 2002 inquiry as to U152 pricing. Stoneridge then refused to process additional orders until its demands for the cancellation charges were met.

53.    In order to secure needed actuator units and perform its contractual obligations with Ford, Intier paid $96,952.59, one-half of the alleged cancellation charges, under protest.

54.    On November 6, 2002, Intier conducted an audit at Stoneridge's premises, and determined that many (if not all) of Stoneridge's alleged cancellation costs were unfounded and/or unsupported.

55.    Stoneridge has been unjustly enriched and benefited by its retention of the unfounded and/or unsupported cancellation costs paid it by Intier, which has incurred a corresponding unfair detriment.

56.    Stoneridge has no right to retain the cancellation costs demanded by it and paid by Intier, which in equity belong to Intier. Stoneridge's retention of these amounts would be unjust, and would allow it to reap unfair benefits from its false claims of expenses, which it did not truly and legitimately incur.

27

57.    As a direct result of Stoneridge's actions, Intier has sustained substantial damages and Stoneridge has been unjustly enriched. Stoneridge's unjust enrichment includes its retention of unfounded and unsupported cancellation costs paid to it by Intier.

58.    Intier is entitled to recovery of Stoneridge's unjust enrichment as it lacks an adequate remedy at law.

## COUNTERCLAIM III

## (Breach of Contract)

59.    Intier realleges and incorporates herein by reference the allegations of Paragraphs 1 through 58 as though fully set forth herein.

60.    Stoneridge contends that Intier's September 12, 2002 inquiry on U152 actuator pricing was, in effect, an order for ADLAs which Stoneridge accepted, thereby creating a contract.

61.    In accordance with the parties' long history of dealing, industry custom, and the implied duty of good faith and fair dealing, Stoneridge could assess only legitimately-incurred cancellation charges to Intier, actually and truly sustained by Stoneridge in direct relation to the cancellation of an ADLA order.

62.    In demanding $265,500 in cancellation charges, Stoneridge breached its alleged contract with Intier, in that this amount was not legitimately and truly incurred by Stoneridge in relation to the September 13, 2002 cancellation of the September 12, 2002 order. In addition, Stoneridge breached the alleged contract by its failure to mitigate any expenses that it may have actually incurred in relation to Intier's cancellation of the order.

63.    Stoneridge's breach of its alleged contractual agreement with Intier has caused Intier to be damaged in an amount to be determined at trial.

## COUNTERCLAIM IV

### (Violation of Mass. Gen. Laws c. 93A)

64.    Intier realleges and incorporates herein by reference the allegations of Paragraphs 1 through 63 as though fully set forth herein.

65.    Intier is a "corporation" and engages in "trade or commerce" within the meaning of Mass. Gen. Laws c. 93A, § 1.

66.    Stoneridge is a "corporation" and engages in "trade or commerce" within the meaning of Mass. Gen. Laws c. 93A, § 1.

67.    Stoneridge engaged in unfair business practices.  For example, Stoneridge set a unilateral price increase for U152 actuators, imposed false and unsubstantiated cancellation charges and then held Intier hostage by refusing to fill orders for U152 and standard ADLAs until receipt of payment of those charges.  Stoneridge engaged in these activities knowing that Intier could not afford to risk disrupting its supply of automotive parts to its customer, the Ford Motor Company.

68.    The unfair acts and practices of Stoneridge that give rise to this c. 93A claim, on information and belief, took place primarily and substantially in Massachusetts, as said acts were engaged in by Stoneridge in Massachusetts.

69.    Stoneridge's practices as set forth above constitute willful and knowing violations of Mass. Gen. Laws c. 93A.

70.    As a direct result of Stoneridge's practices, Intier has or will suffer substantial harm and damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim plaintiff Intier prays that this Court award Intier its damages, double or treble damages, attorneys' fees and costs, and Stoneridge's unjust enrichment as well as interest pursuant to these Counterclaims, and any other relief that may be necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

DEFENDANT AND COUNTERCLAIM PLAINTIFF INTIER AUTOMOTIVE CLOSURES INC. DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE IN THE AMENDED COMPLAINT AND COUNTERCLAIM.

Respectfully submitted,

INTIER AUTOMOTIVE CLOSURES INC.

By: _____

Mark D. Smith (B.B.O. #542676)
FAXON & LAREDO, LLP
15 Broad Street, Suite 600
Boston, Massachusetts  02109-3803
(617) 367-7984

Thomas D. Rein
Deanna L. Keysor
Jamie L. Secord
SIDLEY AUSTIN BROWN & WOOD, LLP
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois  60603
(312) 853-7000

Date:   August 13, 2003

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail on _____ August 13, 2003 _____

30

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STONERIDGE CONTROL DEVICES,
INC.,
                    Plaintiff

v.                                                    CIVIL ACTION NO. 02-CV-10803-JLT

INTIER AUTOMOTIVE CLOSURES,
                    Defendant

**AGREED MOTION TO DISMISS**
**CERTAIN STONERIDGE CLAIMS**

Plaintiff and counterdefendant, Stoneridge Control Devices, Inc., and defendant and

counterclaimant, Intier Automotive Closures, Inc., hereby move the Court to dismiss with

prejudice Stoneridge's claim for Violation of and Unlawful Use of Trade Secrets and Proprietary

Information (Amended Complaint, Count IV).  The parties have further agreed that, to the extent

Stoneridge's claim for Violation of Mass. Gen. Laws Chapter 93A (Amended Complaint, Count

V) relates to any alleged misappropriation, it shall also be dismissed with prejudice.

Stoneridge's Chapter 93A claim also relates to other alleged wrongdoing and this aspect of

Count V shall not be dismissed.  In support of their agreed motion, the parties state as follows:

(1)     This Court has jurisdiction over Stoneridge's claims for Violation of and

Unlawful Use of Trade Secrets and Proprietary Information and Violation of Mass. Gen. Laws

Chapter 93A and over the parties hereto.

(2)     The parties have agreed to allow Stoneridge to dismiss with prejudice its claim for

Violation of and Unlawful Use of Trade Secrets and Proprietary Information.  To the extent that

the plaintiff's claim for Violation of Mass. Gen. Laws Chapter 93A claim relates to any alleged

misappropriation of trade secrets, it shall also be dismissed with prejudice.  The Chapter 93A

claim as to other alleged wrongful conduct shall not be dismissed.

(3)     Each party has agreed to bear its own costs as to Stoneridge's claim for Violation

of and Unlawful Use of Trade Secrets and Proprietary Information and its claim for Violation of

Mass. Gen. Laws Chapter 93A, to the extent that claim relates to any alleged misappropriation.


Respectfully submitted,

Intier Automotive Closures, Inc.                    Stoneridge Control Devices, Inc.


/s/ Mark D. Smith                                   /s/ Paul E. White
Mark D. Smith – BBO No. 542676                      Edward J. Barshak – BBO No. 032040
Laredo & Smith, LLP                                 Paul E. White – BBO No. 549584
15 Broad Street, Suite 600                          Anthony V. Agudelo – BBO No. 642260
Boston, MA 02109-3803                               Sugarman, Rogers, Barshak & Cohen, P.C.
(617) 367-7984                                      101 Merrimac Street
                                                    Boston, MA 02114-4737
Thomas D. Rein                                      (617) 227-3030
Deanna L. Keysor
Jamie L. Secord
Sidley Austin Brown & Wood, LLP
10 South Dearborn Street
Bank One Plaza
Chicago, IL 60603
(312) 853-7000


Dated:  August ____, 2004

*April 2005*

SAE100



# auto motive
# engineering
## international

**aei** *Best* **Engineered** *Vehicle* **2005**

## *Sensors and Software*
## *SAE 2005 World Congress*
## *Chicago Auto Show*

Charleston County Public Library
CURRENT COPY

**SAE***International*™

*************************AUTO** 3-DIGIT 294
M0009702SAU 001 120 0410 23 APR 001 0494
                                    2051900005
CHARLESTON COUNTY LIBRARY
68 CALHOUN ST
CHARLESTON                    SC 29401-3508



**Agility.**

## See the opportunity.
## Go fast. Deliver.

## That's Agility.
## That's Intier.

Sized for agility and programmed for delivery, Intier Automotive developed today's hottest minivan innovation — stow-in-floor seating technology.

From concept award to production, Intier quickly moved to deliver an OEM opportunity in just 15 months. Around the world and throughout the market, when opportunity strikes, Intier-agility gets you there.

Interiors

Seating

Closures

**INTIER**

Automotive

MAGNA'S INTERIORS COMPANY

intier.com

Circle 233



**See the opportunity.
Go fast. Deliver.**

## That's Agility.
## That's Intier.

*Sized for agility and programmed for delivery, Intier Automotive developed today's hottest minivan innovation – stow-in-floor seating technology.*

*From concept award to production, Intier quickly moved to deliver an OEM opportunity in just 15 months. Around the world and throughout the market, when opportunity strikes, Intier-agility gets you there.*

**INTIER**

*intier.com*

MAGNA'S INTERIORS COMPANY



# BPA
### WORLDWIDE™
BUSINESS

No. 176/12-04
Comparable

**BUSINESS PUBLICATION CIRCULATION STATEMENT**
**FOR THE 6 MONTH PERIOD ENDED DECEMBER 2004**
No attempt has been made to rank the information contained in this report in order of importance, since BPA Worldwide believes this is a judgment, which must be made by the user of the report.

Two Corporate Drive, Ninth Floor
Shelton, CT 06484-6259
Phone (203) 447-2800
FAX (203) 447-2900
www.bpaww.com

Since 1931, BPA Worldwide has set the standard for thoroughness, accuracy, transparency and timeliness in media and event audits.

For media buyers and media owners all over the globe, BPA Worldwide helps turn assurance into insight, and insight into advantage.

A not-for-profit organization since 1931, BPA Worldwide, is governed by a tripartite board comprised of media owners, advertising agencies and advertisers. BPA has the largest membership of any media auditing organization in the world, spanning more than 20 countries. Worldwide, BPA serves 3,000 media properties including more than 2,000 B-to-B publications, more than 600 consumer magazines and newspapers, more than 300 Web sites, plus events, email newsletters, databases, wireless and other advertiser-supported media—as well as more than 2,600 advertiser and agency members.

Visit www.bpaww.com for the latest audit reports, membership information and publishing and advertising industry news.

## automotive engineering international



automotive engineering international
Lighting Goes Digital
Technologies and Products of the Year
SAE International

Society of Automotive Engineers, Inc.
400 Commonwealth Drive
Warrendale, PA 15096
Tel. No.: (724) 776-4841
FAX No.: (724) 776-4026

Official Publication of: None
Established: 1917
Issues Per Year: 12

### FIELD SERVED
AUTOMOTIVE ENGINEERING INTERNATIONAL serves the automotive design and manufacturing field which consists of pro-ducers of passenger cars, trucks and buses, truck trailers and bodies, agricultural tractors and equip-ment, construction equipment, industrial vehicles, recreational vehicles, motor homes, and other vehicle systems. It also serves makers of engines, original equipment and replacement parts and components, and materials used in these vehicle systems, as well as other OEM suppliers, fleet operations, government, engineering, education and others allied to the field.

### DEFINITION OF RECIPIENT QUALIFICATION
Recipients are qualified by their affiliations with the above businesses and by their titles in corporate management, administration, engineering and design, manufacturing and production, purchasing, sales and marketing and others allied to the field including libraries and company copies.

### AVERAGE NON-QUALIFIED CIRCULATION

| NON-QUALIFIED Not Included Elsewhere | Copies |
|---|---|
| Other Paid Circulation | 168 |
| Advertiser and Agency | 2,063 |
| Rotated or Occasional | 2 |
| Allocated for Trade Shows and Conventions | 3,834 |
| All Other | 1,827 |
| **TOTAL** | **7,894** |

*See Paragraph 11

### 1. AVERAGE QUALIFIED CIRCULATION BREAKOUT FOR PERIOD

| QUALIFIED CIRCULATION | Total Qualified Copies | Total Qualified Percent | Qualified Non-Paid Copies | Qualified Non-Paid Percent | Qualified Paid Copies | Qualified Paid Percent |
|---|---|---|---|---|---|---|
| Individual | 32,882 | 38.5 | 29,446 | 34.5 | 3,436 | 4.0 |
| Sponsored Individually Addressed | - | - | - | - | - | - |
| *Membership Benefit | 52,264 | 61.3 | 2208 | 2.6 | 50,056 | 58.7 |
| Multi-Copy Same Addressee | 169 | 0.2 | - | - | 169 | 0.2 |
| Single Copy Sales | - | - | - | - | - | - |
| **TOTAL QUALIFIED CIRCULATION** | **85,315** | **100.0** | **31,654** | **37.1** | **53,661** | **62.9** |

### 2. QUALIFIED CIRCULATION BY ISSUES WITH REMOVALS AND ADDITIONS FOR PERIOD

| 2004 Issue | Number Removed | Number Added | Qualified Non-Paid | Qualified Paid | Total Qualified | 2004 Issue | Number Removed | Number Added | Qualified Non-Paid | Qualified Paid | Total Qualified |
|---|---|---|---|---|---|---|---|---|---|---|---|
| July | 741 | 1,489 | 31,918 | 52,329 | 84,247 | October | 3,498 | 2,389 | 31,605 | 52,031 | 83,636 |
| August | 832 | 964 | 31,779 | 52,600 | 84,379 | November | 1,008 | 3,487 | 31,457 | 54,658 | 86,115 |
| September | 684 | 1,050 | 31,713 | 53,032 | 84,745 | December | 1,344 | 3,991 | 31,449 | 57,313 | 88,762 |
| | | | | | | **TOTAL** | **8,107** | **13,370** | | | |

Automotive Engineering International / December 2004

Automotive Engineering International / December 2004

**2a. BUSINESS/OCCUPATIONAL BREAKOUT OF QUALIFIED CIRCULATION FOR ISSUE OF NOVEMBER 2004**
This Issue is 1.5% or 564 copies above the average of the other 11 issues covered in Paragraph two.
This publication conforms to the uniform business/occupational breakout which was developed by the BPA Worldwide advertiser, agency and publisher
Committees for the Automotive Manufacturing Market in November 1970, revised June 1972, October 1975 and June 1985, requiring participating publications
to report their circulation on a comparable basis by December 1972. A copy of the comparability breakout and title classification manual can be obtained from
BPA Worldwide.

| BUSINESS AND INDUSTRY | TOTAL QUALIFIED | PERCENT OF TOTAL | Qualified Non-Paid | Qualified Paid | Corporate Official (A) | Engineering & Design (C) | | Manufacturing/ Production (D) | Purchasing (E) | Administrative Management/ Sales/ Marketing/ Communications (B, F) | Professors, Instructors & Students (See Note 1) | Libraries, Company Copies & All Other Personnel (See Note 1) (G) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Engineering Mgmt (See Note 1) (B) | Design Engineering (See Note 1) (C) | | | | | |
| **1. Motor Vehicle Manufacturers:** | | | | | | | | | | | | |
| a. Passenger Cars | 11,632 | 13.4 | 4,881 | 6,751 | 608 | 2,511 | 5,240 | 1,200 | 226 | 1,330 | 99 | 418 |
| b. Trucks and Buses | 4,359 | 5.1 | 1,819 | 2,540 | 204 | 1,041 | 1,862 | 637 | 90 | 379 | 14 | 132 |
| c. Truck Trailers and Bodies | 341 | 0.4 | 240 | 101 | 34 | 92 | 92 | 81 | 8 | 25 | 1 | 8 |
| d. Agricultural Tractors & Equipment | 1,253 | 1.5 | 494 | 759 | 70 | 314 | 580 | 144 | 27 | 60 | 4 | 54 |
| e. Construction Equipment | 1,108 | 1.3 | 426 | 682 | 43 | 321 | 476 | 116 | 24 | 69 | 4 | 55 |
| f. Industrial Vehicles | 730 | 0.8 | 325 | 405 | 64 | 198 | 273 | 78 | 16 | 75 | 1 | 25 |
| g. Self-Propelled Recreational Vehicles | 640 | 0.7 | 209 | 431 | 44 | 145 | 270 | 43 | 19 | 42 | 3 | 74 |
| h. Motor Homes | 98 | 0.1 | 71 | 27 | 6 | 23 | 39 | 21 | 1 | 6 | - | 2 |
| Other Vehicle Manufacturing (including Military Vehicles) (See Note 1) | 1,881 | 2.2 | 653 | 1,228 | 201 | 437 | 784 | 173 | 24 | 193 | 6 | 63 |
| Sub-Total: Motor Vehicle Manufacturers | 22,042 | 25.5 | 9,118 | 12,924 | 1,274 | 5,082 | 9,616 | 2,493 | 435 | 2,179 | 132 | 831 |
| **2. Engineering Design Services** | 4,337 | 5.0 | 1,028 | 3,309 | 806 | 809 | 1,954 | 63 | 6 | 364 | 35 | 300 |
| **3. Motor Vehicle Systems and Components:** | | | | | | | | | | | | |
| a. Engines: Internal Combustion, Diesel and Gas Turbines | 3,058 | 3.6 | 1,189 | 1,869 | 193 | 704 | 1,381 | 334 | 37 | 232 | 31 | 146 |
| b. Parts, Accessories and Components Manufacturers | 27,795 | 32.3 | 15,437 | 12,358 | 2,300 | 6,824 | 9,791 | 4,258 | 513 | 3,449 | 49 | 611 |
| Sub-Total: Motor Vehicle Systems and Components | 30,853 | 35.9 | 16,626 | 14,227 | 2,493 | 7,528 | 11,172 | 4,592 | 550 | 3,681 | 80 | 757 |
| **4. Supplying Industries (See Note 2):** | | | | | | | | | | | | |
| a. Plant Equipment Manufacturers | 1,611 | 1.9 | 847 | 764 | 222 | 350 | 452 | 263 | 29 | 252 | 2 | 41 |
| b. Material Manufacturers | 3,130 | 3.6 | 595 | 2,535 | 316 | 697 | 863 | 162 | 30 | 778 | 8 | 276 |
| Sub-Total: Supplying Industries | 4,741 | 5.5 | 1,442 | 3,299 | 538 | 1,047 | 1,315 | 425 | 59 | 1,030 | 10 | 317 |
| Other Related Industries (See Note 1): | | | | | | | | | | | | |
| Fleet Operations | 391 | 0.5 | 25 | 366 | 34 | 64 | 80 | 112 | 6 | 56 | 3 | 36 |
| Government Officials | 1,355 | 1.6 | 300 | 1,055 | 82 | 236 | 492 | 75 | 8 | 250 | 15 | 197 |
| Engineering Educators & Students | 4,630 | 5.4 | 345 | 4,285 | 97 | 113 | 260 | 26 | 14 | 117 | 3,427 | 576 |
| Sub-Total: Other Related Industries | 6,376 | 7.5 | 670 | 5,706 | 213 | 413 | 832 | 213 | 28 | 423 | 3,445 | 809 |
| **5. Others Allied to the Field** | 17,766 | 20.6 | 2,573 | 15,193 | 644 | 769 | 1,238 | 220 | 23 | 698 | 75 | 14,099 |
| **TOTAL QUALIFIED CIRCULATION** | 86,115 | 100.0 | 31,457 | 54,658 | 5,968 | 15,648 | 26,127 | 8,006 | 1,101 | 8,375 | 3,777 | 17,113 |

(A) Corporate Official titles include: Chairman of the Board, President, Vice President, General Manager, Managing Director.
(B) Administrative Management titles include: Comptroller, Treasurer, Personnel Manager, Data Processing Manager, and Assistants to Corporate Officials.
(C) Engineering & Design titles include: Vice President of Engineering, Chief Engineer, Designer, Stylist, Project Engineer, Metallurgist, Director of Research & Development, Evaluation Engineer; Other Engineering Personnel.
(D) Manufacturing/Production titles include: Vice President of Manufacturing, Vice President of Production, Vice President of Purchasing, Production Manager, Plant Manager, Factory Manager, Works Manager, Superintendent, Foreman, Supervisor, Process Engineer, Industrial Engineer, Other Production Personnel.
(E) Purchasing titles include: Vice President of Purchasing, Purchasing Agent, Buyer.
(F) Sales/Marketing/Communications titles include: Sales Manager, Marketing Manager, Advertising Manager, Merchandising Manager, Public Relations Manager, and Technical Representative.
Note 1: Non-compatible additional data report at the publisher's option.

Automotive Engineering International / December 2004

## 3b. QUALIFICATION SOURCE BREAKOUT OF QUALIFIED CIRCULATION FOR ISSUE OF NOVEMBER 2004

| QUALIFICATION SOURCE | Qualified Within | | | Qualified Non-Paid | Qualified Paid | Total Qualified | Percent |
|---|---|---|---|---|---|---|---|
| | 1 year | 2 years | 3 years | | | | |
| I. TOTAL – Personal direct request from the recipient: | 20,456 | 2,437 | 2,815 | 21,503 | 4,205 | 25,708 | 29.9 |
| a. Written | 10,299 | 1,682 | 2,248 | 11,944 | 2,285 | 14,229 | 16.6 |
| b. Telecommunication | 3,033 | 182 | 558 | 1,965 | 1,808 | 3,773 | 4.4 |
| c. Internet and E-Mail | 7,124 | 573 | 9 | 7,594 | 112 | 7,706 | 8.9 |
| II. TOTAL – Request from recipient's company: | 201 | 26 | - | 194 | 33 | 227 | 0.2 |
| a. Written | 33 | - | - | - | 33 | 33 | - |
| b. Telecommunication | 168 | 26 | - | 194 | - | 194 | 0.2 |
| c. Internet and E-Mail | - | - | - | - | - | - | - |
| III. TOTAL – Membership Benefit: | 49,063 | 3,456 | 8 | 2,208 | 50,319 | 52,527 | 61.0 |
| a. Individual | 49,063 | 3,456 | 8 | 2,208 | 50,319 | 52,527 | 61.0 |
| b. Organizational | - | - | - | - | - | - | - |
| IV. TOTAL – Communication from recipient or recipient's company (other than request): | 9 | 7 | - | - | 16 | 16 | - |
| a. Written | 9 | 7 | - | - | 16 | 16 | - |
| b. Telecommunication | - | - | - | - | - | - | - |
| c. Internet and E-Mail | - | - | - | - | - | - | - |
| V. TOTAL – Sources other than above (listed alphabetically): | 4,218 | 4 | 3,415 | 7,552 | 85 | 7,637 | 8.9 |
| *Association rosters and directories | 4,165 | - | 3,331 | 7,496 | - | 7,496 | 8.7 |
| Business directories | - | - | - | - | - | - | - |
| Independent field reports | - | - | - | - | - | - | - |
| Licensees – National, State or Local Government | - | - | - | - | - | - | - |
| Manufacturer's, distributor's and wholesaler's lists | - | - | - | - | - | - | - |
| *Other sources | 53 | 4 | 84 | 56 | 85 | 141 | 0.2 |
| VI. TOTAL – Single Copy Sales: | | | | | | | |
| TOTAL QUALIFIED CIRCULATION | 73,947 | 5,930 | 6,238 | 31,457 | 54,658 | 86,115 | 100.0 |
| *See Paragraph 11                    PERCENT | 85.9 | 6.9 | 7.2 | 36.5 | 63.5 | 100.0 | |

## 3c. MAILING ADDRESS BREAKOUT OF QUALIFIED CIRCULATION FOR ISSUE OF NOVEMBER 2004

| MAILING ADDRESS | Qualified Non-Paid | Qualified Paid | Total Qualified | Percent |
|---|---|---|---|---|
| Individuals by name and title and/or function | 31,448 | 53,937 | 85,385 | 99.2 |
| Individuals by name only | - | - | - | - |
| Titles or functions only | 9 | - | 9 | - |
| Company names only | - | 555 | 555 | 0.6 |
| Multi-Copy Same Addressee copies | - | 166 | 166 | 0.2 |
| Single Copy Sales | - | - | - | - |
| TOTAL QUALIFIED CIRCULATION | 31,457 | 54,658 | 86,115 | 100.0 |

## 4. GEOGRAPHICAL BREAKOUT OF QUALIFIED CIRCULATION FOR ISSUE OF NOVEMBER 2004

| State & Zip Code | Qualified Non-Paid | Qualified Paid | Total Qualified | Percent | State & Zip Code | Qualified Non-Paid | Qualified Paid | Total Qualified | Percent |
|---|---|---|---|---|---|---|---|---|---|
| 039-049 Maine | 62 | 53 | 115 | | 400-427 Kentucky | 409 | 248 | 657 | |
| 030-038 New Hampshire | 52 | 107 | 159 | | 370-385 Tennessee | 503 | 475 | 978 | |
| 050-059 Vermont | 31 | 23 | 54 | | 350-369 Alabama | 183 | 329 | 512 | |
| 010-027 Massachusetts | 292 | 504 | 796 | | 386-397 Mississippi | 74 | 62 | 136 | |
| 028-029 Rhode Island | 33 | 50 | 83 | | EAST SO. CENTRAL | 1,169 | 1,114 | 2,283 | 2.7 |
| 060-069 Connecticut | 323 | 440 | 763 | | 716-729 Arkansas | 78 | 80 | 158 | |
| NEW ENGLAND | 793 | 1,177 | 1,970 | 2.3 | 700-714 Louisiana | 33 | 70 | 103 | |
| 100-149 New York | 745 | 1,067 | 1,812 | | 730-749 Oklahoma | 103 | 221 | 324 | |
| 070-089 New Jersey | 247 | 856 | 1,103 | | 750-799 Texas | 556 | 1,226 | 1,782 | |
| 150-196 Pennsylvania | 619 | 1,244 | 1,863 | | WEST SO. CENTRAL | 770 | 1,597 | 2,367 | 2.7 |
| MIDDLE ATLANTIC | 1,611 | 3,167 | 4,778 | 5.5 | 590-599 Montana | 5 | 20 | 25 | |
| 430-459 Ohio | 2,305 | 2,859 | 5,164 | | 832-838 Idaho | 18 | 57 | 75 | |
| 460-479 Indiana | 1,529 | 1,617 | 3,146 | | 820-831 Wyoming | 2 | 14 | 16 | |
| 600-629 Illinois | 1,442 | 2,222 | 3,664 | | 800-816 Colorado | 97 | 382 | 479 | |
| 480-499 Michigan | 10,315 | 15,685 | 26,000 | | 870-884 New Mexico | 25 | 73 | 98 | |
| 530-549 Wisconsin | 818 | 1,269 | 2,087 | | 850-865 Arizona | 249 | 483 | 732 | |
| EAST NO. CENTRAL | 16,409 | 23,652 | 40,061 | 46.5 | 840-847 Utah | 53 | 123 | 176 | |
| 550-567 Minnesota | 328 | 654 | 982 | | 889-898 Nevada | 35 | 96 | 131 | |
| 500-528 Iowa | 318 | 611 | 929 | | MOUNTAIN | 484 | 1,248 | 1,732 | 2.0 |
| 630-658 Missouri | 286 | 299 | 585 | | 995-999 Alaska | 4 | 11 | 15 | |
| 580-588 North Dakota | 23 | 138 | 161 | | 980-994 Washington | 144 | 517 | 661 | |
| 570-577 South Dakota | 30 | 39 | 69 | | 970-979 Oregon | 172 | 346 | 518 | |
| 680-693 Nebraska | 104 | 73 | 177 | | 900-961 California | 1,298 | 2,864 | 4,162 | |
| 660-679 Kansas | 114 | 234 | 348 | | 967-968 Hawaii | 7 | 21 | 28 | |
| WEST NO. CENTRAL | 1,203 | 2,048 | 3,251 | 3.8 | PACIFIC | 1,625 | 3,759 | 5,384 | 6.3 |
| 197-199 Delaware | 36 | 44 | 80 | | UNITED STATES | 25,989 | 41,316 | 67,305 | 78.2 |
| 206-219 Maryland | 105 | 423 | 528 | | 969 & 004-009 | | | | |
| 200-205 Washington, DC | 20 | 138 | 158 | | U.S. Territories | 3 | 38 | 41 | |
| 220-246 Virginia | 242 | 636 | 878 | | Canada | 912 | 2,984 | 3,896 | |
| 247-268 West Virginia | 21 | 64 | 85 | | Mexico | 116 | 219 | 335 | |
| 270-289 North Carolina | 498 | 781 | 1,279 | | Other International | 4,437 | 10,098 | 14,535 | |
| 290-299 South Carolina | 319 | 373 | 692 | | APO/FPO | - | 3 | 3 | |
| 300-319 Georgia | 250 | 443 | 693 | | | | | | |
| 320-349 Florida | 434 | 652 | 1,086 | | TOTAL QUALIFIED CIRCULATION | 31,457 | 54,658 | 86,115 | 100.0 |
| SOUTH ATLANTIC | 1,925 | 3,554 | 5,479 | 6.4 | | | | | |

Automotive Engineering International / December 2004

**TOTAL NEW AND RENEWED QUALIFIED PAID SUBSCRIPTIONS ORDERED/SOLD FOR THE PERIOD (SEE PARAGRAPH 11)**
Includes gross subscription sales/orders with unpaid invoices pending.

### 5. PRICES (SEE PARAGRAPH 11)
Average Annual Order Price: 12 Issues for $23.53

| | Total | Percent |
|---|---|---|
| Offers (greater than or equal to 5% of total Orders) | | |
| 12 for $20.00 _____ | | |
| 12 for $115.00 _____ | | |
| All Others_____ | | |
| **TOTAL** | | |

### 6. LENGTH OF SUBSCRIPTIONS (SEE PARAGRAPH 11)

| | Total | Percent |
|---|---|---|
| Less than 1 year _____ | | |
| 1 year or more (but less than two) _____ | | |
| 2 years or more (but less than three) _____ | | |
| 3 years or more _____ | | |
| **TOTAL** | | |

### 7. USE OF FREE PROMOTIONAL INCENTIVES (SEE PARAGRAPH 11)

| | Total | Percent |
|---|---|---|
| Ordered without promotional incentive _____ | | |
| Ordered with editorial promotional incentive _____ | | |
| Ordered with other promotional incentive (See details in Paragraph 11) _____ | | |
| **TOTAL** | | |

### 8. HOW ORDERED (SEE PARAGRAPH 11)

| | Total | Percent |
|---|---|---|
| Ordered by Individuals _____ | | |
| Ordered by sponsors, individually addressed _____ | | |
| Membership benefit_____ | | |
| Ordered as multi-copy same addressee _____ | | |
| Ordered with other product or service (See details in Paragraph 9) _____ | | |
| **TOTAL** | | |

### 9. FIVE CALENDAR YEAR ANALYSIS: AVERAGE ANNUAL AUDITED QUALIFIED CIRCULATION AND CURRENT UNAUDITED CIRCULATION STATEMENTS

| | Audited Data 2001 | Audited Data 2002 | Audited Data 2003 | Circulation Claim *2004 |
|---|---|---|---|---|
| Total Audit Average Qualified: ____ | 120,290 | 104,955 | 91,286 | 83,282 |
| Qualified Non-Paid: ____ | 46,421 | 39,228 | 33,900 | 30,872 |
| Qualified Paid: ____ | 73,869 | 65,727 | 57,386 | 52,411 |
| Post Expire Copies included in Paid Circulation: ____ | **NC | **NC | **NC | **NC |
| Average Annual Order Price: ____ | $12.19 | $12.73 | $13.50 | $23.53 |

*NOTE: 2004 data is unaudited. With each successive year, new data will be added until five years of data is displayed.
**NC = None Claimed.

### 10. PAID CIRCULATION DATA

| | |
|---|---|
| $23.53 | Average Annual Subscription Order Price for the Period Required (includes promotional incentive value, if any) |
| 12 | Issues Per Year |
| **NC | All Single Copy Sales Prices for the Period |
| **NC | Renewal Rate of Paid Subscribers (Optional) |

### 11. ADDITIONAL DATA

**PARAGRAPH 1:**
Qualified paid Benefit of Membership subscriptions averaging 50,056 copies were sold to qualified recipients at the following subscriptions' prices. Member's yearly subscription price of $20.00 was included in the dues and is non-deductible therefrom.

**PARAGRAPH 3b:**
Association rosters and directories include 1 source of circulation for a quantity of 7,498 copies or 8.7%
Other sources include 1 source of circulation for a quantity of 141 copies or 0.2%.

**PARAGRAPH 5, 6, 7, 8:**
The Publisher states that qualified paid subscriptions sales for this period are not available, and as a result, are not reported.

## INTERNATIONAL BREAKOUT OF QUALIFIED CIRCULATION FOR ISSUE OF NOVEMBER 2004

| COUNTRY | TOTAL | COUNTRY | TOTAL | COUNTRY | TOTAL |
|---|---|---|---|---|---|
| **ASIA** | | Belgium | 162 | Ghana | 5 |
| Bangladesh | 2 | Bulgaria | 4 | Kenya | 3 |
| Brunei | 2 | Croatia | 2 | Nigeria | 7 |
| China | 188 | Czech Republic | 20 | Republic Of South Africa | 51 |
| Hong Kong – SAR | 86 | Denmark | 51 | Sudan | 1 |
| India | 1,973 | Estonia | 2 | Zambia | 5 |
| Indonesia | 13 | Finland | 76 | Subtotal | 88 |
| Japan | 1,550 | France | 671 | **NORTH AMERICA** | |
| Korea Rep. | 401 | Germany | 1,564 | Canada | 3,896 |
| Laos | 1 | Greece | 71 | United States Of America | 67,349 |
| Macau | 1 | Hungary | 26 | Mexico | 335 |
| Malaysia | 91 | Iceland | 1 | Subtotal | 71,580 |
| Nepal | 1 | Italy | 545 | **CARIBBEAN** | |
| Pakistan | 13 | Latvia | 4 | Bermuda | 3 |
| Philippines | 13 | Liechtenstein | 1 | Jamaica | 1 |
| Singapore | 65 | Lithuania | 4 | Trinidad And Tobago | 6 |
| Sri Lanka | 7 | Luxembourg | 26 | Virgin Islands UK | 1 |
| Taiwan ROC | 174 | Malta | 4 | Subtotal | 11 |
| Thailand | 36 | Moldova | 2 | **CENTRAL AMERICA** | |
| Uzbekistan | 4 | Monaco | 2 | Panama | 1 |
| Vietnam | 2 | Netherlands | 162 | Subtotal | 1 |
| Subtotal | 4,623 | Norway | 29 | **SOUTH AMERICA** | |
| **MIDDLE EAST** | | Poland | 43 | Argentina | 64 |
| Bahrain | 2 | Portugal | 56 | Bolivia | 1 |
| Cyprus | 11 | Republic Of Ireland | 35 | Brazil | 1,966 |
| Iran | 10 | Romania | 45 | Chile | 6 |
| Israel | 48 | Russian Federation | 42 | Colombia | 49 |
| Jordan | 3 | San Marino | 1 | Ecuador | 5 |
| Kuwait | 4 | Slovakia | 2 | Peru | 7 |
| Lebanon | 9 | Slovenia | 12 | Uruguay | 1 |
| Oman | 5 | Spain | 290 | Venezuela | 26 |
| Qatar | 2 | Sweden | 379 | Subtotal | 2,125 |
| Saudi Arabia | 6 | Switzerland | 112 | **ASIA PACIFIC** | |
| Turkey | 64 | Ukraine | 8 | Australia | 764 |
| United Arab Emirates | 10 | United Kingdom | 2,112 | Fiji | 2 |
| Subtotal | 174 | Subtotal | 6,691 | New Guinea | 56 |
| **EUROPE** | | **AFRICA** | | Subtotal | 822 |
| Austria | 124 | Botswana | 1 | **TOTAL QUALIFIED CIRCULATION** | 86,115 |
| Belarus | 1 | Egypt | 14 | | |
| | | Ethiopia | 1 | | |

As of August 2002, student members receive their magazine on-line.

### PUBLISHER'S AFFIDAVIT

We hereby make oath and say that all data set forth in this statement are true.

    Lawrence C. Schneider, Publisher

    Martha Schanno, Circulation Manager

(At least one of the above signatures must be that of an officer of the publishing company or its authorized representative.)

**IMPORTANT NOTE:**

This unaudited circulation statement has been checked against the previous audit report.
It will be included in the annual audit made by BPA Worldwide.

| | |
|---|---|
| Date signed | January 28, 2005 |
| State | Pennsylvania |
| County | Allegheny |
| Revised by BPA Worldwide | January 28, 2005 |
| Type | PJR |
| ID Number | A123P0D4 |

www.bpaww.com          Copyright © 2004 BPA Worldwide. All rights reserved.          **Recycled Paper**

# BPA WORLDWIDE℠ BUSINESS

**No. NEC/12-04**

## BUSINESS PUBLICATION CIRCULATION STATEMENT
### FOR THE 6 MONTH PERIOD ENDED DECEMBER 2004

No attempt has been made to rank the information contained in this report in order of importance, since BPA Worldwide believes this is a judgment, which must be made by the user of the report.

**Two Corporate Drive, Ninth Floor**
Shelton, CT 06484-6259
Phone (203) 447-2800
FAX (203) 447-2900
www.bpaww.com

Since 1931, BPA Worldwide has set the standard for thoroughness, accuracy, transparency and timeliness in media and event audits.

For media buyers and media owners all over the globe, BPA Worldwide helps turn assurance into insight, and insight into advantage.

A not-for-profit organization since 1931, BPA Worldwide, is governed by a tripartite board composed of media owners, advertising agencies and advertisers. BPA has the largest membership of any media auditing organization in the world, spanning more than 20 countries. Worldwide, BPA serves 3,000 media properties including more than 2,000 B-to-B publications, more than 600 consumer magazines and newspapers, more than 300 Web sites, plus events, email newsletters, databases, wireless and other advertiser-supported media—as well as more than 2,600 advertiser and agency members.

**Visit www.bpaww.com for the latest audit reports, membership information and publishing and advertising industry news.**



Diesel & Gas Turbine Publications
24901 Northwestern Hwy, Ste 505
Southfield, MI 48075
Tel. No.: (248) 350-8199
FAX No.: (248) 350-2692

Official Publication of: None
Established: 1985
Issues Per Year: 12

### FIELD SERVED
AUTOMOTIVE INDUSTRIES serves the automotive design and manufacturing field consisting of the following: light vehicle manufacturer: passenger cars, trucks, minivans and SUVs; heavy truck and bus manufacturers; suppliers: parts, systems, accessories and components; engines; materials suppliers; independent engineering design services; information technology; and others allied to the field.

### DEFINITION OF RECIPIENT QUALIFICATION
Recipients are qualified first by their association with the above type of organizations, and then by their titles in general/corporate management, engineering, design, production/manufacturing engineering and operations, purchasing, sales, marketing communications, information technology and others as shown in paragraph 3a.

### PURPOSE
This statement includes a supplementary analysis of main vehicles systems worked on by qualified recipients.

| AVERAGE NON-QUALIFIED CIRCULATION | |
|---|---|
| NON-QUALIFIED Not Included Elsewhere | Copies |
| Other Paid Circulation _____ | - |
| Advertiser and Agency _____ | 1,863 |
| Rotated or Occasional _____ | - |
| *Allocated for Trade Shows and Conventions | 158 |
| All Other _____ | 1,890 |
| **TOTAL** | **3,911** |

### 1. AVERAGE QUALIFIED CIRCULATION BREAKOUT FOR PERIOD

| QUALIFIED CIRCULATION | Total Qualified | | Qualified Non-Paid | | Qualified Paid | |
|---|---|---|---|---|---|---|
| | Copies | Percent | Copies | Percent | Copies | Percent |
| Individual_____ | 68,893 | 99.9 | 68,276 | 99.0 | 617 | 0.9 |
| Sponsored Individually Addressed _ | - | - | - | - | - | - |
| Membership Benefit_____ | - | - | - | - | - | - |
| Multi-Copy Same Addressee _____ | 96 | 0.1 | - | - | 96 | 0.1 |
| Single Copy Sales_____ | - | - | - | - | - | - |
| **TOTAL QUALIFIED CIRCULATION** | **68,989** | **100.0** | **68,276** | **99.0** | **713** | **1.0** |

### 2. QUALIFIED CIRCULATION BY ISSUES WITH REMOVALS AND ADDITIONS FOR PERIOD

| 2004 Issue | Number Removed | Number Added | Qualified Non-Paid | Qualified Paid | Total Qualified | 2004 Issue | Number Removed | Number Added | Qualified Non-Paid | Qualified Paid | Total Qualified |
|---|---|---|---|---|---|---|---|---|---|---|---|
| July_____ | 207 | 288 | | | 70,092 | October _____ | 10,577 | 20,998 | | | 71,011 |
| August_____ | 459 | 376 | | | 70,009 | November _____ | 663 | 686 | | | 71,034 |
| September _____ | 11,054 | 1,635 | | | 60,590 | December _____ | 293 | 457 | | | 71,198 |
| | | | | | | **TOTAL** | **23,253** | **24,440** | | | |

**3a. BUSINESS/OCCUPATIONAL BREAKOUT OF QUALIFIED CIRCULATION FOR ISSUE OF NOVEMBER 2004**
This issue is 3.6% or 2,454 copies above the average of the other 5 issues reported in Paragraph two.

| BUSINESS AND INDUSTRY | TOTAL QUALIFIED | PERCENT OF TOTAL | General/ Corporate Management (A) | Engineering & Design (B) | Purchasing (C) | Manufacturing/ Production Engineering (D) | Manufacturing/ Production Operations (E) | Sales/ Marketing/ Communica- tions (F) | Information Technology (G) | Other (H) |
|---|---|---|---|---|---|---|---|---|---|---|
| **1. Manufacturers:** | | | | | | | | | | |
| a. Light Vehicle Manufacturer: Passenger Cars, Light Trucks, SUVs, Minivans | 14,773 | 20.8 | 3,218 | 6,224 | 774 | 1,560 | 1,665 | 615 | 282 | 435 |
| b. Heavy Truck or Bus | 2,864 | 4.0 | 616 | 1,309 | 224 | 238 | 268 | 120 | 36 | 53 |
| Sub-Total: Manufacturers | 17,637 | 24.8 | 3,834 | 7,533 | 998 | 1,798 | 1,933 | 735 | 318 | 488 |
| **2. Suppliers:** | | | | | | | | | | |
| a. Parts, Systems, Components and/or Accessories | 41,624 | 58.6 | 15,735 | 12,452 | 1,543 | 2,913 | 6,300 | 2,145 | 223 | 313 |
| b. Engines: Internal Combustion, Diesel and Gas | 3,611 | 5.1 | 837 | 1,650 | 189 | 285 | 313 | 203 | 28 | 106 |
| c. Materials Suppliers | 2,005 | 2.8 | 596 | 580 | 87 | 114 | 145 | 439 | 9 | 35 |
| d. Independent Engineering Design Services | 3,550 | 5.0 | 585 | 2,630 | 24 | 96 | 32 | 127 | 30 | 26 |
| e. Information Technology | 1,126 | 1.6 | 342 | 279 | 12 | 39 | 41 | 152 | 235 | 26 |
| f. Others Allied to the Field | 1,481 | 2.1 | 339 | 329 | 13 | 57 | 55 | 51 | 4 | 633 |
| Sub-Total: Motor Vehicle Systems and Components | 53,397 | 75.2 | 18,434 | 17,920 | 1,868 | 3,504 | 6,886 | 3,117 | 529 | 1,139 |
| **TOTAL QUALIFIED CIRCULATION** | 71,034 | 100.0 | 22,268 | 25,453 | 2,866 | 5,302 | 8,819 | 3,852 | 847 | 1,627 |

(A) GENERAL/CORPORATE MANAGEMENT: Chairman, President, CEO, Managing Director, General or Division Manager, Senior or Executive VP, Other Senior Mgmt.
(B) ENGINEERING AND DESIGN: Vice President of Engineering, Chief Engineer, Designer, Stylist, Project Engineer, Director of Research & Development, Evaluation Engineer, Other Engineering Personnel.
(C) PURCHASING: Vice President of Purchasing, Director of Purchasing, Purchasing Manager, Purchasing Agent, Buyer, Other Purchasing Titles.
(D) MANUFACTURING/PRODUCTION ENGINEERING: Vice President, Director, Manager, Engineer, Plant Engineer.
(E) MANUFACTURING/PRODUCTION OPERATIONS: Vice President, Director, Manager, Plant Manager, Supervisor, Other Manufacturing Titles.
(F) SALES/MARKETING/COMMUNICATIONS: Vice President, Director, Manager, Other Marketing Titles.
(G) Information Technology.

**SUPPLEMENTARY DATA FOR ISSUE OF NOVEMBER 2004**
This is an analysis of 41,101 (57.9% of the total qualified) respondents who worked on the following main vehicle systems. (See questionnaire used by business and industry to elicit these data on the back of this report.) Since any one respondent may have checked more than one response, the totals for each of these products should not be added together as the total may exceed the total circulation. These data are presented for statistical and marketing purposes only.

| BUSINESS AND INDUSTRY | TOTAL QUALIFIED | PERCENT OF TOTAL | Number of Respondents to one or More Supplementary Category | VEHICLE SYSTEMS | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | EXTERIOR (A) | INTERIOR (B) | CHASSIS (C) | POWERTRAIN (D) | ELECTRICAL/ ELECTRONIC (E) |
| **1. Manufacturers:** | | | | | | | | |
| a. Light Vehicle Manufacturer: Passenger Cars, Light Trucks, SUVs, Minivans | 14,773 | 20.8 | 11,017 | 4,929 | 4,167 | 4,449 | 5,507 | 3,743 |
| b. Heavy Truck or Bus | 2,864 | 4.0 | 2,314 | 1,027 | 928 | 1,319 | 1,309 | 995 |
| Sub-Total: Manufacturers | 17,637 | 24.8 | 13,331 | 5,956 | 5,095 | 5,768 | 6,816 | 4,738 |
| **2. Suppliers:** | | | | | | | | |
| a. Parts, Systems, Components and/or Accessories | 41,624 | 58.6 | 21,562 | 4,300 | 5,787 | 6,368 | 9,023 | 7,468 |
| b. Engines: Internal Combustion, Diesel and Gas | 3,611 | 5.1 | 2,101 | 115 | 129 | 203 | 1,924 | 331 |
| c. Materials Suppliers | 2,005 | 2.8 | 1,334 | 490 | 506 | 390 | 585 | 335 |
| d. Independent Engineering Design Services | 3,550 | 5.0 | 1,834 | 541 | 544 | 640 | 963 | 837 |
| e. Information Technology | 1,126 | 1.6 | 695 | 215 | 225 | 230 | 317 | 463 |
| f. Others Allied to the Field | 1,481 | 2.1 | 244 | 92 | 92 | 87 | 116 | 93 |
| Sub-Total: Motor Vehicle Systems and Components | 53,397 | 75.2 | 27,770 | 5,753 | 7,283 | 7,918 | 12,928 | 9,527 |
| **TOTAL QUALIFIED CIRCULATION** | 71,034 | 100.0 | 41,101 | 11,709 | 12,378 | 13,686 | 19,744 | 14,265 |

Automotive Industries / December 2004

## 3b. QUALIFICATION SOURCE BREAKOUT OF QUALIFIED CIRCULATION FOR ISSUE OF NOVEMBER 2004

| QUALIFICATION SOURCE | Qualified Within | | | Qualified Non-Paid | Qualified Paid | Total Qualified | Percent |
|---|---|---|---|---|---|---|---|
| | 1 year | 2 years | 3 years | | | | |
| I. **TOTAL** – Personal direct request from the recipient: | 44,568 | 6,787 | - | | | 51,355 | 72.3 |
| a. Written | 21,482 | 3,744 | - | | | 25,226 | 35.6 |
| b. Telecommunication | 7,918 | - | - | | | 7,918 | 11.1 |
| c. Internet and E-Mail | 15,168 | 3,043 | - | | | 18,211 | 25.6 |
| II. **TOTAL** – Request from recipient's company: | 428 | 3 | - | | | 431 | 0.6 |
| a. Written | 3 | 3 | - | | | 6 | - |
| b. Telecommunication | 425 | - | - | | | 425 | 0.6 |
| c. Internet and E-Mail | - | - | - | | | - | - |
| III. **TOTAL** – Membership Benefit: | - | - | - | | | - | - |
| a. Individual | - | - | - | | | - | - |
| b. Organizational | - | - | - | | | - | - |
| IV. **TOTAL** – Communication from recipient or recipient's company (other than request): | 2,833 | 1,336 | - | | | 4,169 | 5.9 |
| a. Written | 1,581 | 948 | - | | | 2,529 | 3.6 |
| b. Telecommunication | - | - | - | | | - | - |
| c. Internet and E-Mail | 1,252 | 388 | - | | | 1,640 | 2.3 |
| V. **TOTAL** – Sources other than above (listed alphabetically): | 15,079 | - | - | | | 15,079 | 21.2 |
| Association rosters and directories | | | - | | | | |
| *Business directories | 14,973 | - | - | | | 14,973 | 21.1 |
| Independent field reports | | | - | | | | |
| Licensees – National, State or Local Government | | | - | | | | |
| Manufacturer's, distributor's and wholesaler's lists | | | - | | | | |
| *Other sources | 106 | - | - | | | 106 | 0.1 |
| VI. **TOTAL** – Single Copy Sales: | - | - | - | | | - | - |
| **TOTAL QUALIFIED CIRCULATION** | 62,908 | 8,126 | - | | | 71,034 | 100.0 |
| **PERCENT** | 88.6 | 11.4 | - | | | 100.0 | - |

*See Paragraph 11

Paid Source Information can be reported at the option of the publisher.

## 3c. MAILING ADDRESS BREAKOUT OF QUALIFIED CIRCULATION FOR ISSUE OF NOVEMBER 2004

| MAILING ADDRESS | Qualified Non-Paid | Qualified Paid | Total Qualified | Percent |
|---|---|---|---|---|
| Individuals by name and title and/or function | | | 70,350 | 99.0 |
| Individuals by name only | | | 204 | 0.3 |
| Titles or functions only | | | 75 | 0.1 |
| Company names only | | | 306 | 0.5 |
| Multi-Copy Same Addressee copies | | | 99 | 0.1 |
| Single Copy Sales | | | - | - |
| **TOTAL QUALIFIED CIRCULATION** | | | 71,034 | 100.0 |

## 4. GEOGRAPHICAL BREAKOUT OF QUALIFIED CIRCULATION FOR ISSUE OF NOVEMBER 2004

| State & Zip Code | Qualified Non-Paid | Qualified Paid | Total Qualified | Percent | State & Zip Code | Qualified Non-Paid | Qualified Paid | Total Qualified | Percent |
|---|---|---|---|---|---|---|---|---|---|
| 039-049 Maine | | | 208 | | 400-427 Kentucky | | | 1,203 | |
| 030-038 New Hampshire | | | 240 | | 370-385 Tennessee | | | 1,770 | |
| 050-059 Vermont | | | 97 | | 350-369 Alabama | | | 793 | |
| 010-027 Massachusetts | | | 843 | | 386-397 Mississippi | | | 317 | |
| 028-029 Rhode Island | | | 116 | | EAST SO. CENTRAL | | | 4,083 | 5.7 |
| 060-069 Connecticut | | | 827 | | 716-729 Arkansas | | | 371 | |
| NEW ENGLAND | | | 2,331 | 3.3 | 700-714 Louisiana | | | 250 | |
| 100-149 New York | | | 2,414 | | 730-749 Oklahoma | | | 512 | |
| 070-089 New Jersey | | | 1,074 | | 750-799 Texas | | | 2,327 | |
| 150-196 Pennsylvania | | | 1,869 | | WEST SO. CENTRAL | | | 3,460 | 4.9 |
| MIDDLE ATLANTIC | | | 5,357 | 7.5 | 590-599 Montana | | | 90 | |
| 430-459 Ohio | | | 5,805 | | 832-838 Idaho | | | 132 | |
| 460-479 Indiana | | | 4,007 | | 820-831 Wyoming | | | 29 | |
| 600-629 Illinois | | | 3,697 | | 800-816 Colorado | | | 503 | |
| 480-499 Michigan | | | 15,311 | | 870-884 New Mexico | | | 139 | |
| 530-549 Wisconsin | | | 1,998 | | 850-865 Arizona | | | 707 | |
| EAST NO. CENTRAL | | | 30,818 | 43.4 | 840-847 Utah | | | 333 | |
| 550-567 Minnesota | | | 1,024 | | 889-898 Nevada | | | 152 | |
| 500-528 Iowa | | | 777 | | MOUNTAIN | | | 2,085 | 3.0 |
| 630-658 Missouri | | | 1,200 | | 995-999 Alaska | | | 29 | |
| 580-588 North Dakota | | | 88 | | 980-994 Washington | | | 713 | |
| 570-577 South Dakota | | | 133 | | 970-979 Oregon | | | 591 | |
| 680-693 Nebraska | | | 270 | | 900-961 California | | | 5,021 | |
| 660-679 Kansas | | | 466 | | 967-968 Hawaii | | | 52 | |
| WEST NO. CENTRAL | | | 3,958 | 5.6 | PACIFIC | | | 6,406 | 9.0 |
| 197-199 Delaware | | | 140 | | UNITED STATES | | | 66,051 | 93.0 |
| 206-219 Maryland | | | 525 | | 969 & 004-009 U.S. Territories | | | 18 | |
| 200-205 Washington, DC | | | 40 | | Canada | | | 1,714 | |
| 220-246 Virginia | | | 877 | | Mexico | | | 183 | |
| 247-268 West Virginia | | | 153 | | Other International | | | 3,067 | |
| 270-289 North Carolina | | | 1,649 | | APO/FPO | | | 1 | |
| 290-299 South Carolina | | | 1,168 | | | | | | |
| 300-319 Georgia | | | 1,140 | | | | | | |
| 320-349 Florida | | | 1,861 | | **TOTAL QUALIFIED CIRCULATION** | | | 71,034 | 100.0 |
| SOUTH ATLANTIC | | | 7,553 | 10.6 | | | | | |

Automotive Industries / December 2004

**9. FIVE CALENDAR YEAR ANALYSIS: AVERAGE ANNUAL AUDITED QUALIFIED CIRCULATION AND CURRENT UNAUDITED CIRCULATION STATEMENTS**

| | Audited Data 2001 | Audited Data 2002 | Audited Data 2003 | Circulation Claim *2004 |
|---|---|---|---|---|
| Total Audit Average Qualified: ____ | 91,643 | 72,246 | 69,311 | 69,908 |
| Qualified Non-Paid: ____ | 91,643 | 72,246 | 69,311 | 69,908 |
| Qualified Paid: ____ | - | - | - | - |
| Post Expire Copies Included in Paid Circulation: ____ | **NC | **NC | **NC | **NC |
| Average Annual Order Price: ____ | **NC | **NC | $66.88 | $62.40 |

**10. PAID CIRCULATION DATA**

| | |
|---|---|
| $62.40 | Average Annual Subscription Order Price for the Period Required (includes promotional incentive value, if any) |
| 12 | Issues Per Year |
| **NC | All Single Copy Sales Prices for the Period |
| **NC | Renewal Rate of Paid Subscribers (Optional) |

**\*NOTE: The audited average qualified circulation for January-June 2004 = 70,827. The unaudited average qualified circulation for July-December 2004 = 68,989. Yielding an average qualified circulation of 69,908. With each successive year, new data will be added until five years of data is displayed.**
**\*\*NC = None Claimed**

**11. ADDITIONAL DATA**

**PARAGRAPH 3b:**

Business directories include 1 source of circulation for a quantity of 14,973 copies or 21.1%, including D&B.

Other sources include 1 source of circulation for a quantity of 106 copies or 0.1%.

**PARAGRAPHS 5 THROUGH 8 ARE NOT REQUIRED.**

**QUESTIONNAIRE USED BY PUBLICATION TO ELICIT SUPPLEMENTARY DATA**



**PUBLISHER'S AFFIDAVIT**

We hereby make oath and say that all data set forth in this statement are true.

    Robert A. Wilson, Publisher

    Sheila Lizdas, Circulation Manager

(At least one of the above signatures must be that of an officer of the publishing company or its authorized representative.)

**IMPORTANT NOTE:**

This unaudited circulation statement has been checked against the previous audit report.
It will be included in the annual audit made by BPA Worldwide.

| | |
|---|---|
| Date signed | January 10, 2005 |
| State | Wisconsin |
| County | Waukesha |
| Received by BPA Worldwide | January 10, 2005 |
| Type | PSJ |
| ID Number | A126S0D4 |

 Copyright © 2004 BPA Worldwide. All rights reserved. **Recycled Paper**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, DC 20549

**FORM 20-F**

[   ]    REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

[ X ]    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended:    **December 31, 2003**

OR

[   ]    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number _____

**INTIER AUTOMOTIVE INC.**
(Exact name of Registrant as specified in its charter)

**not applicable**
(Translation of Registrant's name into English)

**Province of Ontario, Canada**
(Jurisdiction of incorporation or organization)

**521 Newpark Boulevard, Newmarket, Ontario, Canada  L3Y 4X7**
(Address of principal executive offices)

Securities registered or to be registered pursuant to Section 12(b) of the Act.

| Title of each class | Name of each Exchange on which registered |
|---|---|
| **None** | **None** |

Securities registered or to be registered pursuant to Section 12(g) of the Act.
**Class A Subordinate Voting Shares**

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.
**None**
(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report.

| | |
|---|---|
| 6,431,261 | **Class A Subordinate Voting Shares** |
| 42,751,938 | **Class B Shares** |
| 1,085,500 | **Preferred Shares, Series 1** |
| 1,125,000 | **Preferred Shares, Series 2** |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ____**X**____          No _____

Indicate by check mark which financial statement item the registrant has elected to follow.

Item 17 _____          Item 18 ____**X**____

## 6.    DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES

### A.    Directors and Senior Management

The name and municipality of residence of the directors and executive officers of the Company, together with their positions and offices held with the Company, are set forth below.

| Name and Municipality of Residence | Position Held with the Company |
|---|---|
| DONALD J. WALKER<br>King Township, Ontario | Director and President and Chief Executive Officer since May 31, 2001; Chairman since February 23, 2004 |
| FLAVIO COTTI<br>Brione S.M., Switzerland | Director since March 27, 2002 |
| NEIL G. DAVIS<br>Brampton, Ontario | Director since August 9, 2001 |
| VINCENT J. GALIFI<br>Woodbridge, Ontario | Director since February 23, 2004 |
| LOUIS E. LATAIF<br>Brookline, Massachusetts | Director since August 9, 2001 and Lead Director since March 25, 2003 |
| EDWARD C. LUMLEY<br>South Lancaster, Ontario | Director since August 9, 2001 |
| RUDOLF STREICHER<br>Vienna, Austria | Director since August 9, 2001 |
| SIEGFRIED WOLF<br>Weikersdorf, Austria | Director since March 27, 2002 |
| LAWRENCE WORRALL<br>Oshawa, Ontario | Director since August 9, 2001 |
| MICHAEL BACCELLIERI<br>Woodbridge, Ontario | Controller since August 14, 2001 |
| PAUL BROCK<br>Thornhill, Ontario | Treasurer since November 5, 2001 |
| BRUCE R. CLUNEY<br>Aurora, Ontario | Secretary since May 31, 2001 |
| RICHARD GWYNN<br>Farmington Hills, Michigan | Vice-President, Human Resources since May 31, 2001 |
| KLAUS IFFLAND<br>Ingolstadt, Germany | President, Intier Europe since May 4, 2004 |
| MICHAEL E. MCCARTHY<br>Aurora, Ontario | Executive Vice-President and Chief Financial Officer since November 5, 2001 |
| SCOTT PARADISE<br>Grosse Point Farms, Michigan | Executive Vice-President, Sales and Marketing since May 6, 2002 |
| MICHAEL SINNAEVE<br>Georgetown, Ontario | Vice-President, Quality and Operational Improvements since May 31, 2001 |
| KARL STEINER<br>Ebergassing, Austria | Executive Vice-President, Sales, Europe since May 31, 2001 |

(1)    Mr. Walker, 47, was appointed as our Chairman on February 23, 2004 and as our President and Chief Executive Officer in February 2001. Prior to that time, Mr. Walker served as Magna's President and Chief Executive Officer.

- 31 -

Exhibit 12.1

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER REGARDING ANNUAL REPORT ON FORM 20-F FOR THE YEAR ENDED DECEMBER 31, 2003

I, Donald J. Walker, President, Chief Executive Officer and Chairman, certify that:

1.  I have reviewed this annual report on Form 20-F of Intier Automotive Inc;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.  The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the company and have:

    (a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  [Reserved]

    (c)  evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.  The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

- 2 -

(a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date:  May 17, 2004

_____*/s/ Donald J. Walker*_____
Name:    Donald J. Walker
         President, Chief Executive Officer
         and Chairman



*Automotive*

# Intier Automotive Inc.

# Annual Information Form

**March 31, 2005**

## ITEM 6. DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES

### A.    Directors and Senior Officers

The name, province or state (where applicable) and country of residence of the directors and executive officers of the Company, together with their positions and offices held with the Company, are set forth below.

| Name and Municipality of Residence | Offices Held with the Company |
| --- | --- |
| DONALD J. WALKER (C)<br>Ontario, Canada | Director and President and Chief Executive Officer since May 31, 2001; Chairman since February 23, 2004 |
| FLAVIO COTTI<br>Brione S.M., Switzerland | Director since March 27, 2002 |
| NEIL G. DAVIS (B)(C)(D)<br>Ontario, Canada | Director since August 9, 2001 |
| VINCENT J. GALIFI (B)<br>Ontario, Canada | Director since February 23, 2004 |
| LOUIS E. LATAIF (A)(B)<br>Massachusetts, U.S.A. | Director since August 9, 2001 and Lead Director since March 25, 2003 |
| EDWARD C. LUMLEY(A)(B)<br>Ontario, Canada | Director since August 9, 2001 |
| RUDOLF STREICHER<br>Vienna, Austria | Director since August 9, 2001 |
| SIEGFRIED WOLF<br>Weikersdorf, Austria | Director since March 27, 2002 |
| LAWRENCE WORRALL(A)(C)(D)<br>Ontario, Canada | Director since August 9, 2001 |
| MICHAEL BACCELLIERI<br>Ontario, Canada | Controller since August 14, 2001 |
| PAUL BROCK<br>Ontario, Canada | Treasurer since November 5, 2001 |
| BRUCE R. CLUNEY<br>Ontario, Canada | Secretary since May 31, 2001 |
| RICHARD GWYNN<br>Michigan, U.S.A. | Vice-President, Human Resources since May 31, 2001 |
| KLAUS IFFLAND<br>Ingolstadt, Germany | President, Intier Europe since May 4, 2004 |
| MICHAEL E. MCCARTHY<br>Ontario, Canada | Executive Vice-President, Finance since May 31, 2001 and Executive Vice-President and Chief Financial Officer since November 5, 2001 |
| SCOTT PARADISE<br>Michigan, U.S.A. | Executive Vice-President, Sales and Marketing since May 6, 2002 |
| MICHAEL SINNAEVE<br>Ontario, Canada | Vice-President, Quality and Operational Improvements since May 31, 2001 |
| KARL STEINER<br>Ebergassing, Austria | Executive Vice-President, Sales, Europe since May 31, 2001 |

(A) – Member of the Audit Committee
(B) – Member of the Corporate Governance and Compensation Committee

- 24 -

(C) – Member of the Health and Safety and Environmental Committee
(D) – Member of the Special Committee

The principal occupations of the above directors and executive officers during the preceding five years as set out below.

(1)    Mr. Walker, 48, was appointed as our Chairman on February 23, 2004 and as our President and Chief Executive Officer in February 2001. Prior to that time, Mr. Walker served as Magna's President and Chief Executive Officer.

(2)    Mr. Cotti, 65, is currently Chairman of the International Advisory Board of the Credit Suisse Group as well as a member of the Board of Directors of Fiat S.p.A. and Georg Fischer Ltd and a member of the Board of Trustees of the Jakobs Foundation. He was formerly the President of the Swiss Confederation in 1991 and 1998. He also served as the Swiss Minister of Home Affairs from 1988 to 1992 and Swiss Minister of Foreign Affairs from 1993 until April 1999.

(3)    Mr. Davis, 49, has been a lawyer and partner in the law firm of Davis Webb Schulze & Moon since 1983.

(4)    Mr. Galifi, 45, served as the Executive Vice-President of Finance from September 1996 until his appointment as Executive Vice-President and Chief Financial Officer of Magna in December 1997. Magna's principal business is the design, development and manufacture of automotive systems, assemblies, modules and components as well as engineering and assembly of complete vehicles.

(5)    Mr. Lataif, 66, has served as Dean of the School of Management of Boston University for the past fourteen years. Prior to that time, he was employed at Ford Motor Company for approximately 27 years in various senior operational and sales and marketing capacities, including President, Ford of Europe, and Vice-President, North American Sales Operations. He also serves on the boards of Sanyo Electric Company, InterAudi Bank, The Iacocca Foundation, Magna Entertainment Corporation and Group One Automotive.

(6)    Mr. Lumley, 65, is a Vice-Chairman of BMO Nesbitt Burns Inc., prior to which he was Chairman of Noranda Manufacturing Inc. and a Minister of the Crown for the Government of Canada. BMO Nesbitt Burns Inc. is a provider of investment and corporate banking services. He currently serves on the boards of a number of public companies, including Magna International Inc., Magna Entertainment Corporation, Bell Canada Enterprises and Canadian National Railway.

(7)    Mr. Streicher, 66, currently a consultant since 2000, was Chief Executive Officer of OIAG prior to that time in 1999 and part of 2000. He is the Chairman of the Supervisory Board of Boehler Uddeholm AG. He has also previously served as the Austrian Minister for Economic Affairs and Transportation as well as the Managing Director and Chairman of the Board of Steyr-Daimler-Puch AG and Austria Metall AG.

(8)    Mr. Wolf, 47, is employed by certain European subsidiaries of Magna and, in addition to being a director of Magna and the Company, is currently the Executive Vice-Chairman of Magna (since May 9, 2002). Prior to that time, Mr. Wolf was Vice-Chairman of Magna (since January 14, 2002), prior to which he served as the President and Chief Executive Officer of Magna's Magna Steyr group (since February 21, 2001). Prior to that time, Mr. Wolf was the Vice-Chairman of Magna (since March 8, 1999) as well as the President of Magna Europe (since July 1, 1995).

(9)    Mr. Worrall, 61, a Certified Management Accountant, is retired and worked for over 30 years in various financial and operational capacities at General Motors of Canada Limited. Prior to his retirement, Mr. Worrall was Vice-President, Purchasing, Strategic Planning and Operations as well as a member of the board of directors of General Motors of Canada Limited.

(10)   Mr. Baccellieri, 37, a Chartered Accountant, was appointed Controller on August 14, 2001. Prior to that time he served in various corporate finance positions at Magna since 1995.

(11)   Mr. Brock, 43, has served as Treasurer since November 5, 2001. Prior to that time he served as Assistant Treasurer at Magna.